Miguel SOTO, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2000–SC–0828–MR.

Supreme Court of Kentucky.

April 22, 2004.

Rehearing Denied Aug. 26, 2004.

---

Randall L. Wheeler, Thomas M. Ransdell, Asst. Public Advocates, Frankfort, for Appellant.

Gregory D. Stumbo, Atty. Gen., Elizabeth A. Heilman, Brian T. Judy, Asst. Attys Gen., Frankfort, Michael G. Wilson, Cincinncti, OH, for Appellee.

COOPER, Justice.

Appellant, Miguel Soto, was convicted by an Oldham Circuit Court jury of the murders of his former mother- and father-in law, Edna and Armott Porter, the attempted murder of his ex-wife, Armotta Porter, the first-degree wanton endangerment of his three-year-old daughter, Brianna, the first-degree burglary of the Porter residence, and tampering with physical evidence. He was sentenced to death for each murder conviction, to twenty years imprisonment each for his convictions of attempted murder and first-degree burglary, and to five years imprisonment each for his convictions of wanton endangerment and tampering with physical evidence. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b); KRS 532.075(1). For the reasons explained herein, we affirm.

Appellant married Armotta Porter in August 1995. They separated two months later. Armotta and her fifteen-year-old son from a previous marriage then moved into the Crestwood, Kentucky, residence of her parents, Armott and Edna Porter. According to Armotta, Appellant "stalked" her during the months following their separation. Armotta was pregnant with Appellant's child when they separated. That child, their daughter Brianna, was born in May 1996. Appellant and Armotta were divorced one month later.

Appellant came to the Porter home in July 1996 asking to see Armotta. At Armotta's request, her father advised Appellant that she did not wish to see him and ordered him to leave. In August 1996, the Porter residence was burglarized. The perpetrator left a coat at the scene that the Porters believed belonged to Appellant. Mr. Porter filed a criminal complaint in the Oldham District Court charging Appellant with burglary in the second degree, a Class C Felony. KRS 511.030(2). On October 17, 1996, the day of the prelimi-

nary hearing, the Oldham District Court dismissed the charge without prejudice conditioned upon Appellant having no further contact with the complaining witness (Mr. Porter), reenlisting in the military service within sixty days, and remaining away from Oldham County, Kentucky. Appellant reenlisted in the United States Army and lived in California until he was reassigned to Ft. Knox, Kentucky, in April 1999. The Porters had no contact with him after October 17, 1996, until June 29, 1999.

On June 26, 1999, Monica Nahand, with whom Appellant had been living for approximately one month, ordered him to move out of her residence. Before leaving, Appellant gave away or otherwise discarded all of his personal belongings except for the contents of a black duffel bag, explaining that he did not need his belongings "where he was going." Three days later, on June 29, 1999, Appellant, armed with a .38 caliber revolver and a .45 caliber automatic pistol, parked his automobile at the Crestwood Army Recruiting Station and walked three miles to the Porter residence. When he arrived at approximately 5:30 p.m., Mrs. Porter was inside the house and Mr. Porter was outside working in the garden. Appellant concealed himself in a shed where Mr. Porter stored his garden tools. When Mr. Porter entered the shed, Appellant killed him by shooting him once in the chest and once in the back with the .38 revolver. Leaving Mr. Porter's corpse in the shed and placing a board against the shed's door, Appellant entered the residence and killed Mrs. Porter, also shooting her once in the chest and once in the back with the .38 revolver. He wrapped her corpse in a comforter and placed it at the foot of her bed, then waited for Armotta.

Armotta arrived at the residence with Brianna[1] shortly before 6:00 p.m. and parked her automobile in the attached garage. When she entered the kitchen, she was immediately confronted by Appellant who placed the .45 automatic pistol to her head and told her that he had killed her parents and intended to kill her. Armotta persuaded Appellant not to kill her in the presence of their daughter but to take her someplace away from the residence in her automobile. Once inside the garage, Armotta attempted to escape by running back into the house. As she opened the door to the kitchen, Appellant shot her in the back with the .45 automatic. The bullet entered Armotta's lower back, pierced her kidney and colon, and exited through her lower abdomen. Still, she managed to close and lock the door, shielding Brianna with her body. Appellant fired two additional rounds through the door, one of which struck Armotta's left knee. Armotta managed to dial 911 for emergency assistance.

At approximately 6:30 p.m., Appellant appeared at the residence of Mitch Nobles, a retired police detective who lived near the Porter residence and who had attended Appellant and Armotta's wedding. Appellant ultimately confessed to shooting all three victims. Although the police never located the .45 automatic, they found the .38 revolver under a stack of folded clothes on a clothes dryer inside the Porter residence. A ballistics test matched the .38 revolver with the bullet fragments removed from the bodies of Mr. and Mrs. Porter. The serial number on the .38 revolver matched that of a weapon that a former employer had issued to Appellant, which Appellant had not returned.

## I. INDICTMENT.

Appellant asserts that the indictment charging him with two counts of capital

1. She had left her son at a nearby baseball park.

murder was defective because it did not recite the statutory aggravating circumstances upon which the Commonwealth relied to authorize capital punishment. He interprets three recent decisions of the United States Supreme Court, *i.e., Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), as requiring that an indictment charging a defendant with a capital offense must recite the aggravating circumstances authorizing capital punishment.

*Jones, supra,* held that the Sixth Amendment requires that facts triggering the provisions of the federal car-jacking statute, 18 U.S.C. § 2119, that authorize higher penalties if the offense resulted in serious bodily injury or death, must be charged in the indictment. *Id.* at 251–52, 119 S.Ct. at 1228. The Court concluded that those provisions were not mere sentencing factors but were elements of the offense. *Id.; compare* KRS 509.040(2) (offense of kidnapping enhanced from Class B felony to Class A felony if victim suffered serious physical injury, and to capital offense if victim died during or as a result of the kidnapping).

In *Apprendi, supra,* the defendant was convicted of a second-degree firearm offense that was enhanced pursuant to an independent "hate crime" statute that authorized imposition of an enhanced sentence if the trial judge found by a preponderance of the evidence that the crime was motivated by racial bias. Finding that the "preponderance of the evidence" standard violated the Fourteenth Amendment, *Id.* at 497, 120 S.Ct. at 2366–67, the Court held that "[o]ther than the fact of a prior con-

viction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. at 2362–63. However, *Apprendi* did not address the failure of the indictment to charge a violation of the hate crime statute. *Id.* at 477 n. 3, 120 S.Ct. at 2356 n. 3 ("Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment .... We thus do not address the indictment question separately today.").

*Ring, supra,* held that an Arizona statute permitting a trial judge sitting without a jury to determine the presence or absence of statutory aggravating factors necessary to impose the death penalty, violated the Sixth Amendment right to trial by jury. *Id.* at 609, 122 S.Ct. at 2443 (*overruling Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)). "Capital defendants, no less than non-capital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589, 122 S.Ct. at 2432. *Ring* also did not address the constitutionality of the indictment. *Id.* at 597 n. 4, 122 S.Ct. at 2437 n. 4 ("Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him .... Ring does not contend that his indictment was constitutionally defective.")

■ *Apprendi* and *Ring* focused on a defendant's procedural due process rights. Appellant, however, interprets *Ring* as holding that aggravating circumstances are, substantively, elements of the offense, not factors relevant only to sentencing. He cites *Jones, supra,* for the proposition

that such elements must be recited in the indictment. Under federal law, an indictment must set forth all of the elements of the offense. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). Factors relevant only to sentencing, however, are not elements of the offense. *Almendarez–Torres v. United States,* 523 U.S. 224, 228, 118 S.Ct. 1219, 1223, 140 L.Ed.2d 350 (1998). Regardless, we are not bound by federal law on this issue because, as noted in *Apprendi, supra,* the Fourteenth Amendment has never been construed to incorporate against the states "the Fifth Amendment right to 'presentment or indictment by a Grand Jury.'" *Id.* at 477 n. 3, 120 S.Ct. at 2355 n. 3 (citation omitted). Thus, while Appellant's interpretation of *Jones, Apprendi,* and *Ring* may be an accurate prediction of the future course of federal law, we decline to adopt that interpretation and, instead, apply existing Kentucky law to his issue.[2]

■ Criminal Rule (RCr) 6.10(2) provides that an indictment is sufficient if it contains "a plain, concise and definite statement of the essential facts constituting the specific offense with which the defendant is charged." Further, RCr 6.10(1) requires only that the indictment provide sufficient information to give the defendant *notice* of the charge(s). *Caudill*

*v. Commonwealth,* Ky., 120 S.W.3d 635, 650 (2003); *Thomas v. Commonwealth,* Ky., 931 S.W.2d 446, 449 (1996). Count I of the indictment charged that:

> On or about June 29, 1999, in Oldham County, Kentucky, the above-named defendant, MIGUEL SOTO, committed the offense of Murder when he entered the home of Armott and Edna Porter, without permission, while armed with a deadly weapon and while engaged in the commission of Burglary in the first degree, with the intent to cause the death of another he caused the death of Armott Porter by shooting him with a firearm, all in violation of KRS 507.020 and 532 .025, contrary to other laws, statutes and regulations as made and provided in such cases and against the peace and dignity of the Commonwealth of Kentucky.

Count II of the indictment charged Appellant with Mrs. Porter's murder using essentially the same language. The caption of the indictment stated that Appellant was charged with two counts of "Murder, Capital Offense," and cited the applicable statutory provisions, *i.e.,* KRS 507.020 (murder) and KRS 532.025(2)(a) (aggravating circumstances). Thus, the indictment gave Appellant notice that he was charged with two counts of murder and that the Commonwealth would prove aggravating

**2.** Several states share this view. *See, e.g., Terrell v. State,* 276 Ga. 34, 572 S.E.2d 595, 602 (2002) (*Apprendi* and *Ring* did not render unconstitutional Georgia procedure that provided notice of aggravating factors through other means, such as written notice); *State v. Tisius,* 92 S.W.3d 751, 766–67 (Mo.2002) (*Apprendi* did not require inclusion of aggravating circumstances in indictment because death was the maximum penalty for murder in Missouri); *State v. Dellinger,* 79 S.W.3d 458, 467 (Tenn.2002) ("The *Apprendi* holding applies only to sentencing procedures under

which judges sentence the defendants.") (citation omitted). *See also United States v. Jackson,* 327 F.3d 273, 284 (4th Cir.2003) (while *Ring* "requires that an aggravating factor necessary to imposition of the federal death penalty" under 18 U.S.C. § 3593, be alleged in the indictment, "[t]he Supreme Court did not, however, address the scope of the Fifth Amendment Indictment Clause in *Ring* because that case came from a State system and the Fifth Amendment Indictment Clause has not been incorporated against the States.") (citation omitted).

circumstances authorizing the death penalty.

KRS 532.025(1)(a) provides that the Commonwealth may introduce at a capital sentencing hearing "only such evidence in aggravation as the state has made known to the defendant prior to his trial." This notice requirement is satisfied by timely filing a formal notice of intent to seek the death penalty and the aggravating circumstances upon which the Commonwealth intends to rely. *Furnish v. Commonwealth,* Ky., 95 S.W.3d 34, 41 (2002); *Commonwealth v. Maricle,* Ky., 15 S.W.3d 376, 379 (2000); *cf. Smith v. Commonwealth,* Ky., 845 S.W.2d 534, 536–538 (1993) (defendant did not receive adequate notice of Commonwealth's intent to seek death penalty when prosecutor filed formal notice only six days before trial).

On August 23, 1999, thirty-eight days after the indictment was rendered and almost ten months prior to trial, the Commonwealth filed a formal notice of its intent to seek the death penalty, listing the aggravating circumstances described in KRS 532.025(2)(a)(2), (6), and (8). The notice was both adequate and timely.

## II. SPEEDY TRIAL.

Appellant's trial began on June 20, 2000, slightly less than one year after his arrest. He asserts that this delay violated his constitutional right to a speedy trial. In *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court identified four factors to be considered when determining whether a defendant's right to a speedy trial has been violated, *viz:* (1) length of delay; (2) reason for delay; (3) actual assertion of the right; and (4) resulting prejudice. *Id.* at 530, 92 S.Ct. at 2192. A finding with respect to any one factor is not necessary or determinative of a speedy trial violation; instead, "they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533, 92 S.Ct. at 2193.

An analysis of the last three *Barker* factors is triggered only upon a determination that the length of delay was "presumptively prejudicial." *Id.* at 530, 92 S.Ct. at 2192; *Cain v. Smith,* 686 F.2d 374, 381 (6th Cir.1982). There is no fixed time period from which to gauge the existence of presumptive prejudice. Instead, "the length of the delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case . . . . [T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker, supra,* at 530–31, 92 S.Ct. at 2192.

The delay of less than one year between Appellant's arrest and his trial is, at best, on the borderline of being presumptively prejudicial. *State v. Myers,* 97 Ohio St.3d 335, 780 N.E.2d 186, 204 (2002) (delay of less than one and one half years between defendant's indictment and trial was "barely sufficient" to be "presumptively prejudicial"); *Herring v. State,* 691 So.2d 948, 955 (Miss.1997) (delay of eight months or longer is presumptively prejudicial) (citations omitted); 4 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, *Criminal Procedure* § 18.2(b) (2d ed. Supp.2004) ("Though there are some cases which do not fit this mold, it may generally be said that any delay of eight months or longer is 'presumptively prejudicial.'" (Quotation omitted.)). *But see State v. Coffin,* 128 N.M. 192, 991 P.2d 477, 501 (1999) (given complexity of capital murder case, fifteen-month delay might not be presumptively prejudicial). Nevertheless, application of

the remaining *Barker* factors reveals that no constitutional violation occurred in this case.

The reasons for delay in this case were not egregious. Appellant verbally demanded a speedy trial at a pretrial hearing held on August 4, 1999. The trial judge advised Appellant that his demand should be submitted in writing and would be considered at that time. During a pretrial hearing held on October 7, 1999, the Commonwealth informed the trial court that its discovery was only "eighty percent" complete, explaining that the delay in discovery was the result of newly discovered evidence and the fact that the police still had not located the .45 caliber handgun used to shoot Armotta. On November 18, 1999, Appellant, by counsel, requested a June 2000 trial date. Accordingly, the trial court scheduled the trial for June 13, 2000. On March 2, 2000, Appellant sent the trial judge a three-page letter demanding a speedy trial and specifically requesting an April 2000 trial date. At a pretrial conference on March 16, 2000, the trial court denied Appellant's request for an April date, finding that the complex nature of the case justified the delay and that Appellant would not be significantly prejudiced by an additional delay of two months. The Commonwealth noted that discovery still had not been completed, citing delays in obtaining forensic evidence. Finally, at a hearing on April 20, 2000, the trial court rescheduled the start of Appellant's trial from June 13 to June 20, 2000, so that he could attend professional education seminars provided in conjunction with the annual meeting of the Kentucky Bar Association.

Thus, the trial court gave Appellant the June 2000 trial date that he initially requested. There is no indication that the delays in completing discovery were "deliberate attempt[s] to delay the trial in order to hamper the defense." *Barker, supra,* at 531, 92 S.Ct. at 2192; *see also State v. Myers, supra,* at 205 (delay in forensic testing not weighed against prosecution where delay did not appear to be result of bad faith). Nor is Appellant entitled to a dismissal because the trial judge delayed the trial one additional week in order to complete his continuing judicial education requirements. The reasons for the delay in this case do not weigh against the Commonwealth.

The trial court treated Appellant's letter of March 2, 2000, as a formal demand for a speedy trial. Thus, the third *Barker* factor weighs slightly in Appellant's favor even though the demand was not made until more than seven months after his arrest and less than four months before the scheduled trial date.

While the mere fact of incarceration is prejudicial, *Barker, supra,* at 532–33, 92 S.Ct. at 2193; *Tamme v. Commonwealth,* Ky., 973 S.W.2d 13, 23 (1998), Appellant does not claim that the delay impaired his ability to offer evidence he desired to present or otherwise prejudiced his defense. We conclude that Appellant's constitutional right to a speedy trial was not violated.

## III. SELF–INCRIMINATION.

Appellant filed a motion to suppress various incriminating statements he made both before and after his arrest, claiming the statements were involuntary due to his intoxication and police coercion and thus obtained in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At the pretrial suppression hearing, the Commonwealth presented the testimony of four witnesses: (1) Mitch Nobles, the retired

Louisville Police Department detective at whose residence Appellant appeared shortly after the commission of the offenses; (2) Gary Nobles, Mitch's brother, who was present at Mitch's residence when Appellant appeared; (3) Oldham County Sheriff's Detective Mark Hoskins, the arresting officer; and (4) Oldham County Sheriff's Deputy Scott Veech, who was present when three of the four self-incriminating statements were made.

 Mitch and Gary Nobles testified that they were standing on the deck behind Mitch's residence when Appellant suddenly appeared from around the corner of the house, shirtless, wet, covered in dirt and soot, and with several visible lacerations on his body. Appellant stated that he "wanted to turn himself in" because the "cops are looking for me." After contacting local authorities to advise of Appellant's presence on his property, Mitch asked Appellant what had happened. Appellant replied, "I f-ked up my life. It's been screwed up for the last four years." He then described how he had left his automobile at the Crestwood recruiting station and walked to the Porter residence. No *Miranda* warnings were given prior to these statements. However, Appellant was not in custody, and neither of the Nobleses was then a law enforcement officer. "*Miranda*, itself, was concerned only with custodial interrogation, which means questioning initiated by law enforcement officers after a person has been taken into custody." *Adkins v. Commonwealth*, Ky., 96 S.W.3d 779, 791 (2003) (quotations omitted); *see also Fields v. Commonwealth*,

Ky., 12 S.W.3d 275, 283–84 (2000) (*Miranda* not applicable where incriminating statement was in response to questioning by hospital employee who was not a state actor).

Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

*Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). Both of the Nobles brothers further testified that they observed no outward indication that Appellant was intoxicated when he made these statements.

Shortly thereafter, Hoskins arrived at the Nobles residence. He testified that he arrested and handcuffed Appellant and advised him of his *Miranda* rights, and that Appellant responded that he understood his rights. Hoskins also testified that Appellant gave no indication of being intoxicated at the time of his arrest. Hoskins transported Appellant to the Porter residence. Mitch Nobles followed in his own vehicle. Other officers already present at the crime scene were searching for both Mr. Porter and the weapon or weapons used to shoot Edna and Armotta Porter. Because of his prior acquaintance with Appellant, Mitch Nobles volunteered to question him as to the location of Mr. Porter and the missing weapon(s).[3] Nobles questioned Appellant in the back seat of Hoskins's police cruiser while Veech listened through a partially opened window. Appellant told Nobles that Mr. Porter was "in the shed." This information was relayed

---

**3.** At this point, Nobles became a state actor, *see Adkins, supra,* at 791 (citing *United States v. Garlock,* 19 F.3d 441, 443 (8th Cir.1994)), but, of course, Appellant had already been given the *Miranda* warnings. *Hughes v. Com-*

*monwealth,* Ky., 87 S.W.3d 850, 853–54 (2002) (no requirement that suspect be readvised of *Miranda* rights merely because of passage of time or change of questioner).

to other officers who, indeed, found Mr. Porter's corpse in the shed. Appellant also advised Nobles that he had "buried the gun in a creek." Both Mitch Nobles and Veech testified that Appellant did not slur his speech and did not smell of alcohol while being questioned inside the police cruiser.

Hoskins, Veech, and Mitch Nobles transported Appellant to a substation of the Oldham County Police Department for the purpose of obtaining a recorded statement. Upon entering the air-conditioned building, Appellant, still wet and shirtless, complained of being cold and was given a smock to wear. Veech twice re-apprised Appellant of his *Miranda* rights and Appellant signed a written waiver-of-rights form. During the course of the approximately twenty-five-minute interrogation, Appellant admitted killing Mr. and Mrs. Porter, shooting Armotta, burglarizing the Porter residence, and concealing the .45 caliber handgun in a creek. Nobles and Veech testified that Appellant exhibited no signs of intoxication during the interrogation, and although he was restrained by handcuffs and a waist chain, did not complain of discomfort and did not invoke either his right to silence or his right to counsel.

Following the interrogation, Hoskins and Veech transported Appellant to a local hospital for blood and urine tests. Appellant's urine tested positive for the presence of PCP, cocaine, and amphetamines. His blood tested positive for diphenhydramine (antihistamines) at levels that a toxicologist later testified were "above therapeutic."[4] While at the hospital, Appellant volunteered to the officers that "every-

thing you need to know is on the dryer." The .38 revolver, as well as .38 caliber and .45 caliber ammunition were found folded into some clothing lying on top of a clothes dryer inside the Porter residence.

After hearing this testimony and listening to Appellant's audiotaped confession, the trial court found that Appellant had been properly advised of and had voluntarily waived his *Miranda* rights, and that the statements he made at the Nobles residence, the Porter residence, the police substation, and the hospital were voluntary. Appellant claims the trial court's findings were clearly erroneous because (1) Hoskins failed to adequately advise him of his *Miranda* rights; (2) he invoked his right to remain silent during the audiotaped interrogation; and (3) his statements were rendered involuntary by his intoxication and police coercion. We disagree.

### A. *Miranda warnings.*

Appellant did not claim either in his suppression motion or during the suppression hearing that he was improperly advised of his *Miranda* rights. Thus, the trial court did not make a specific finding of fact with respect to this issue. Nevertheless, it is easily resolved on the record.

■ In quickly reciting the *Miranda* rights from memory during the suppression hearing, Hoskins failed to include a criminal defendant's right to appointed counsel. There was no allegation that Hoskins failed to advise Appellant of that right at the time of his arrest on June 29, 1999. Of course, the issue is not whether Hoskins correctly recited the *Miranda*

---

4. There was trial testimony that diphenhydramine is a non-prescription drug commonly found in over-the-counter medications such as Benadryl and that it often causes drowsiness but is not intoxicating.

rights at the suppression hearing but whether he correctly advised Appellant of his rights at the time of the arrest. Even after hearing Hoskins's misstatement, the trial court found that he did advise Appellant of his *Miranda* rights at the time of his arrest, and that finding was supported by substantial evidence, *i.e.,* Hoskins's testimony that he did so. RCr 9.78.

### B. *Invocation of silence.*

Appellant claims that Mitch Nobles and Veech violated his Fifth Amendment right against self-incrimination when they continued to interrogate him at the police substation after he invoked his right to silence. Although not raised at the suppression hearing, this issue is also easily resolved on the record. During the course of the interrogation, Nobles asked Appellant whether he said anything to Armotta when he first confronted her inside the Porter residence. Appellant's response was: "I trust myself not to say anything." After reviewing the recorded confession, which included this statement, the trial court found that Appellant had not invoked his right to remain silent. On review of the audiotape we conclude that this finding was not clearly erroneous. Appellant continued to answer questions after the statement was made without expressing any desire to discontinue the interrogation.

■ Once an accused in custody unequivocally invokes the right to remain silent, interrogation must ordinarily cease. *Miranda, supra,* at 473–74, 86 S.Ct. at 1627–28; *Campaneria v. Reid,* 891 F.2d 1014, 1021 (2d Cir.1989); *Anderson v. Smith,* 751 F.2d 96, 101–02 (2d Cir.1984). However, the statement in question was not unequivocal and, given the context, *i.e.,* response to inquiry as to what he said to Armotta, not what he did to Armotta, it

cannot even be fairly characterized as an equivocal or ambiguous invocation of the right to remain silent. *Springer v. Commonwealth,* Ky., 998 S.W.2d 439, 445 (1999); *see also Bradley v. Meachum,* 918 F.2d 338, 342 (2d Cir.1990) (accused's statement that he was not going to say whether he was involved in crime followed by immediate denial of involvement not invocation of right to silence).

■ Finally, Appellant had already confessed to the offenses of which he was ultimately convicted before the statement was made and did not provide any significant information thereafter, thus rendering any possible error harmless beyond a reasonable doubt.

### C. *Voluntariness.*

■ The ultimate test of voluntariness lies in an examination of the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973); *Mills v. Commonwealth,* Ky., 996 S.W.2d 473, 481 (1999). Under this rubric, a confession is voluntary unless, under the totality of the circumstances, a defendant's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth, supra,* at 225, 93 S.Ct. at 2047. This requires an examination of both the "characteristics of the accused and the details of the interrogation." *Id.* at 226, 93 S.Ct. at 2047.

Appellant presented no evidence during the suppression hearing that Mitch Nobles, Hoskins, or Veech used any coercive measures or promises of leniency in order to obtain his confession. In fact, the officers responded to Appellant's only complaint of discomfort by providing him with a smock. Thus, we summarily reject Appellant's claim of police coercion.

Nor was there any evidence of intoxication except for Appellant's positive blood and urine tests. Even if there had been other evidence, merely showing that a defendant was intoxicated when a statement was made does not render the statement involuntary. *Britt v. Commonwealth*, Ky., 512 S.W.2d 496, 501 (1974). The "basic question" when reviewing the voluntariness of a confession obtained from an intoxicated defendant "is whether the confessor was in sufficient possession of his faculties to give a reliable statement." *Id.* at 500. Here, Appellant exhibited no outward signs of intoxication at the time he made the challenged statements. While he frequently attempted to change subjects during the interrogation, he gave accurate and detailed information concerning the type of vehicle he drove that evening, where he had parked it, the location of Mr. Porter's body, and the manner in which he had committed the offenses. Although Appellant vomited several times after his arrest, Veech testified that Appellant explained that he often vomited when he was very nervous. Thus, despite the presence of drugs in his body, Appellant's actions before and after his arrest did not rise to the level of "mania" required in *Britt, supra*, to render his statements involuntary. *Id.* at 499. *See also Halvorsen v. Commonwealth*, Ky., 730 S.W.2d 921, 927 (1986) (fact that defendant was under the influence of alcohol and marijuana at the time he gave his confession to police insufficient to render confession involuntary).

## IV. JURY SELECTION.

### A. *Failure to excuse jurors for cause.*

Appellant asserts that the trial judge erred by failing to excuse eight jurors for cause. However, Appellant did not even request that four of the eight, Jurors 20, 81, 113, and 200A, be excused. We review unpreserved allegations of error in death penalty cases under the standard established in *Cosby v. Commonwealth*, Ky., 776 S.W.2d 367 (1989), *overruled on other grounds by St. Clair v. Roark*, Ky., 10 S.W.3d 482, 487 (1999), and *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665 (1990), *viz:*

> (1) whether there was a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic, and (2) if there is no reasonable explanation, whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed.

*Sanders, supra*, at 668. "Counsel's decisions during voir dire are generally considered to be matters of trial strategy." *Hodge v. Commonwealth*, Ky., 17 S.W.3d 824, 837 (2000) (citations omitted). None of these four jurors had formed an opinion as to Appellant's guilt or innocence and all stated that they could consider the full range of penalties and mitigating circumstances. We find no error in the trial judge's failure to *sua sponte* excuse these jurors for cause.

Appellant's motions to excuse Jurors 42, 54, 70, and 143, for cause were overruled. A determination whether to excuse a juror for cause lies within the sound discretion of the trial court and is reviewed only for a clear abuse of discretion. *Foley v. Commonwealth*, Ky., 953 S.W.2d 924, 931 (1997). We are also mindful that:

> Voir dire examination occurs when a prospective juror quite properly has lit-

tle or no information about the facts of the case and only the most vague idea as to the applicable law .... many citizens are astounded to learn that being under the influence of drugs or alcohol may be considered by them as factors mitigating the punishment which should be imposed. Predictably, when asked whether they believe being under the influence should mitigate punishment, the answer is often in the negative.

*Mabe v. Commonwealth*, Ky., 884 S.W.2d 668, 671 (1994). Applying these principles, we conclude that the trial court did not abuse its discretion in overruling Appellant's motions to excuse Jurors 42, 54, 70, and 143, for cause.

■ *Juror 42* was the director of a domestic violence center. However, she was an administrator, not a psychologist. She stated that she was detached from the emotional aspects of assisting victims of domestic violence and that her position would not affect her ability to be fair and impartial in this case. *Compare Alexander v. Commonwealth*, Ky., 862 S.W.2d 856, 862–64 (1993) (abuse of discretion to refuse to excuse for cause juror who was an investigative social worker with Child Protection Services and who stated that her employment would affect her ability to be fair and impartial in case involving child sexual abuse), *overruled on other grounds by Stringer v. Commonwealth*, Ky., 956 S.W.2d 883, 891 (1997).

■ Juror 42 also favored the death penalty for aggravated murder because she believed that the biblical philosophy of an "eye for an eye" was the original basis for our legal system. However, she also stated that she could consider the full range of penalties and some, but not all, of the statutory mitigating circumstances enumerated by defense counsel during voir dire. A trial court is not required to excuse a juror for cause merely because the juror favors severe penalties, so long as he or she can consider the full range of penalties. *Hodge, supra,* at 836–37; *compare Thomas v. Commonwealth*, Ky., 864 S.W.2d 252, 254–55 (1993) (abuse of discretion not to strike juror for cause who stated that he would "definitely" vote for the death penalty). Nor was the trial judge required to strike Juror 42 for cause because of her "eye for an eye" remark, *Stopher v. Commonwealth*, Ky., 57 S.W.3d 787, 796–97 (2001), especially in view of her assurance that she could impose a lesser sentence than death. *Compare Thompson v. Commonwealth*, Ky., 862 S.W.2d 871, 875–76 (1993) (abuse of discretion not to excuse for cause juror who repeatedly emphasized his strong belief in the death penalty and the "eye for an eye" philosophy), *superseded on other grounds by RCr 9.38 as recognized by Perdue v. Commonwealth*, Ky., 916 S.W.2d 148, 159 (1995).

■ *Juror 70* also favored the death penalty for a conviction of aggravated murder but stated that he could consider the full range of penalties and mitigating circumstances. *Hodge, supra,* at 836–37.

■ *Juror 54* knew several officers of the Oldham County Sheriff's Department who had attended his daughter's wedding. Both his daughter and his son-in-law were police officers and his son-in-law had previously worked with the Oldham County Commonwealth's Attorney's office on a capital case. In addition, Juror 54 was the manager of a local Kroger grocery store (at the time of her death, Mrs. Porter was a cashier at a different Kroger store) and his wife worked at a local hospital where Armotta was also employed (though he did

not know whether they were acquainted). Juror 54 had not had any contact with any Oldham County sheriff's deputies for four years and stated that he did not know the victims or any of the facts of the case.

Juror 54's acquaintance with members of the Oldham County Sheriff's Department does not approach the kind of "close relationship" giving rise to implied bias under *Ward v. Commonwealth*, Ky., 695 S.W.2d 404, 407 (1985). *See Dillard v. Commonwealth*, Ky., 995 S.W.2d 366, 369 (1999) (no implied bias attributed to juror who knew some police officers who testified at trial); *Sanders, supra*, at 670 (fact that juror was a police officer in county of trial and knew several testifying officers did not establish bias). Nor did the facts that Juror 54 and Mrs. Porter were both employees of Kroger or that Juror 54's wife worked at the same hospital as Armotta establish implied bias. *Dillard, supra*, at 369 (no implied bias where juror worked as a fireman at same station at which victim served as captain); *Copley v. Commonwealth*, Ky., 854 S.W.2d 748, 750 (1993) (no implied bias where several jurors were employed at same factory as victim and his girlfriend); *Sanders, supra*, at 669 (no implied bias even though juror worked with victim's spouse).

▮▮▮▮ *Juror 143* stated that he might give "slightly" more weight to the testimony of a police officer than to that of a layperson. He otherwise stated that he could render a fair and impartial decision considering all of the facts of the case, including the entire range of penalties and mitigating circumstances. "It is the probability of bias or prejudice that is determinative in ruling on a challenge for cause." *Pennington v. Commonwealth*, Ky., 316 S.W.2d 221, 224 (1958) (citation omitted). Juror 143's responses did not establish implied bias against Appellant. *See Sholler v. Commonwealth*, Ky., 969 S.W.2d 706, 708–09 (1998) (no implied bias where juror was "very pro-law enforcement" and would give substantial credence to testimony of police officer but who did not indicate any bias against defendants). Appellant did not testify at trial and does not cite to any instance where a police officer's trial testimony contradicted that of a lay witness. Thus, Appellant could not have been prejudiced by Juror 143's statement that he would give more credibility to the testimony of a police officer than to that of a lay witness.

### B. Excusal of juror for cause.

▮▮▮▮ The trial court excused *Juror 63* because his ability to impose the death penalty was substantially impaired. Juror 63 informed the Court that he would "have a problem with the death penalty," that he felt it was "wrong," that he had "personal convictions that weighed heavily against being able to consider it," and "[m]y gut feeling tells me that I am not one of the people who could impose the death penalty." Defense counsel attempted rehabilitation by asking Juror 63 whether he could consider the death penalty under any circumstances, to which the juror responded, "I guess I could consider it. However, you know, I really don't think that I could ever cast my vote to impose that." The trial court correctly concluded that Juror 63's views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quotation and citation omitted); *Caudill*, 120 S.W.3d at 654.

## V. RIGHT TO BE PRESENT.

RCr 8.28(1) provides:

The defendant shall be present at the arraignment, at every critical stage of the trial including the empaneling of the jury and the return of the verdict, and at the imposition of the sentence. The defendant's voluntary absence after the trial has been commenced in his or her presence shall not prevent proceeding with the trial up to and including the verdict. . . .

■■■ A defendant's presence, however, can be waived by counsel. *Caudill, supra,* at 651; *see United States v. Riddle,* 249 F.3d 529, 534 (6th Cir.2001) (defense counsel could waive defendant's right under Fed.R.Crim.P. 43(a) to be present at voir dire). We have also held that a defendant waives the right to be present at an in-chambers hearing by failing to object to his exclusion. *Watkins v. Commonwealth,* Ky., 105 S.W.3d 449, 453 (2003). That holding applies as well with respect to in-chambers examinations of prospective jurors. *Byrd v. Commonwealth,* Ky., 825 S.W.2d 272, 274 (1992), *overruled on other grounds by Shadowen v. Commonwealth,* Ky., 82 S.W.3d 896, 897 (2002). And while challenging jurors for cause is an essential component to the process of empaneling the jury, *Lewis v. United States,* 146 U.S. 370, 374, 13 S.Ct. 136, 137, 36 L.Ed. 1011 (1892) ("For every purpose, therefore, involved in the requirement that the defendant shall be personally present at the trial where the indictment is for a felony, the trial commences at least from the time when the work of empaneling the jury begins."); *United States v. Miller,* 463 F.2d 600, 603 (1st Cir.1972) ("The challenging of prospective jurors is an essential part of the trial . . . .") (Citations omitted.)), a defendant's exclusion from the jury selection process is subject to harmless error analysis, *Riddle, supra,* at 535; *United States v. Gibbs,* 182 F.3d 408, 437

(6th Cir.1999), and will not warrant reversal absent a showing of prejudice. *Sanders v. Commonwealth,* Ky., 89 S.W.3d 380, 388–89 (2002).

### A. Pretrial conference.

■■■ Appellant was in attendance at a pretrial conference held on June 19, 2000, the day before jury selection began. After the trial court ruled on various matters, including Appellant's motion to suppress evidence, Appellant was taken from the courtroom and returned to jail. Shortly thereafter, the trial judge *sua sponte* mentioned to those remaining in the courtroom, including members of the Commonwealth's Attorney's office, defense counsel, and several members of the sheriff's office, that a member of the jury panel was a contract attorney for the Department of Public Advocacy (Appellant's trial counsel were also DPA attorneys). An unidentified person then mentioned that another juror was his sister. Without objection, the trial judge excused both of these prospective jurors for cause. *Ward, supra,* at 407 (bias implied when prospective juror has "a close relationship, be it familial, financial or situational, with any of the parties, counsel, victims or witnesses"). Appellant claims the excusal of these two jurors in his absence violated his right to be present at a critical stage of the trial. However, these jurors were excused for situational bias. Appellant could not have provided any additional information regarding these jurors that would have affected the requirement that they be excused for cause. Since he could have contributed nothing by being present at this "hearing," he suffered no prejudice because of his absence. *Sanders,* 89 S.W.3d at 389.

### B. Hardship excusals.

■ On the morning of June 20, 2000, prior to commencement of voir dire, the trial judge met with counsel for both sides in his chambers to discuss six members of the jury panel who had requested hardship excusals on their juror qualification forms. Over a period of thirty minutes, the trial judge interviewed each of the six jurors with respect to their requests. He then excused five of the six jurors for hardship reasons. Appellant was not present during these interviews. However, hardship excusals are within the discretion of the trial judge, Admin. Proc., Part II, § 12(1), and are not required to be decided in open court or in the presence of or in consultation with any parties or their counsel. *Caudill, supra,* at 651–52. When a juror requests a hardship excusal on the day of trial, the request "shall be heard in a bench conference," if the juror so desires or "at the discretion of the court." Admin. Proc., Part II, § 9(1). A defendant has no constitutional right to participate in these proceedings or to be present when these decisions are made.

### C. In-chambers voir dire.

■ On June 26, 2000, during the course of the general voir dire, three jurors indicated that they had prior knowledge of the case and defense counsel requested that they be further questioned in chambers so as not to "contaminate" the other jurors with their information. When the judge began arrangements for Appellant to be escorted into chambers, defense counsel advised, "Judge, I don't think he [indicating Appellant] needs to be back there." Thus, defense counsel expressly waived Appellant's presence during the ensuing questioning of these jurors in chambers. *Riddle, supra,* at 535; *Caudill, supra,* at 651.

■ Shortly after the conclusion of this in-chambers hearing, the trial judge questioned another prospective juror in chambers while Appellant remained in the courtroom. This juror asserted that she had previously been the victim of a crime and indicated that her experience would affect her ability to be impartial in this case. Defense counsel's motion to excuse her for cause was sustained. Technically, defense counsel did not repeat the previous waiver of Appellant's presence at this in-chambers hearing. However, his absence was clearly harmless since the juror was adverse to Appellant's cause and was excused on motion of defense counsel. No more could have been accomplished had Appellant been present. *Riddle, supra,* at 535; *Gibbs, supra,* at 437; *Sanders,* 89 S.W.3d at 388–89. Nor did Appellant's absence from this hearing deny him due process of law. "So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only." Snyder v. Massachusetts,* 291 U.S. 97, 107–08, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934) (emphasis added), *overruled on other grounds by Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). *See also See v. Commonwealth,* Ky., 746 S.W.2d 401, 402–03 (1988) (exclusion of defendant from witness competency hearing did not violate rights under Kentucky Constitution). Because Appellant's presence would have contributed nothing to the result, a fair and just hearing was not thwarted by his absence.

### D. Extra-judicial communication with juror.

The jury was finally seated and sworn on Wednesday, June 28, 2000. The trial judge admonished the jurors in accordance with RCr 9.70 "not to permit anyone to speak to, or communicate with [you] on

any subject connected with the trial, and that *all attempts to do so should be immediately reported by [you] to the court.*" (Emphasis added.) Court was then adjourned until Wednesday, July 5, 2000.

On the morning of July 5, 2000, *Juror 182* reported to the trial judge that his brother-in-law had, over his protestations, discussed the case with him during a Fourth of July family gathering the previous day. The judge held an in-chambers hearing on this issue with the juror, the prosecutor, and defense counsel while Appellant remained in the courtroom. During the hearing, Juror 182 revealed that his brother-in-law owned a service station and mini-market in Louisville and that Appellant was employed there when the killings occurred (a fact previously unknown to Juror 182). Juror 182's brother-in-law had also remarked that Appellant had "killed his in-laws" and may have been "under the influence of cocaine or something." Juror 182 stated that this information would not affect his impartiality because, except for the employment situation, his brother-in-law did not tell him anything that he had not already read in the newspapers. After questioning Juror 182 and eliciting no additional information, defense counsel moved that he be excused as the alternate juror. The motion was denied.

■ Appellant does not assert that it was error to overrule the motion to excuse Juror 182 but only that he was entitled to be present at the hearing on the motion. However, Appellant did not object to his exclusion, *Watkins, supra,* at 453; *Byrd, supra,* at 274, and does not suggest how a fair and just hearing on this issue was thwarted by his absence. *Snyder, supra,* at 107–08, 54 S.Ct. at 333. There was substantial evidence at trial that Appellant

"had killed his in-laws" and no evidence to the contrary. The evidence was also uncontradicted that Appellant's urine tested positive for cocaine. Juror 182's brother-in-law was not a trial witness and Appellant does not suggest what other information his former employer might have possessed and imparted to Juror 182 that would have prejudiced the juror against him. Defense counsel unsuccessfully attempted to have Juror 182 excused from the jury and Appellant does not suggest how his presence would have changed that outcome. *Sanders,* 89 S.W.3d at 388–89 (defendant's right to due process not violated by exclusion from hearing regarding juror's acquaintance with victim's father because there was "nothing that [the defendant] could have done by being present").

## VI. RIGHT TO CONTROL DEFENSE.

Appellant asked the trial court to prohibit defense counsel from presenting any evidence of extreme emotional disturbance (EED) during the course of the trial. In response, defense counsel asked the trial judge to make a determination per *Jacobs v. Commonwealth,* Ky., 870 S.W.2d 412 (1994), whether Appellant was making a voluntary and intelligent waiver of his EED defense. During an *ex parte* hearing on the issue outside the presence of the prosecutor, Appellant articulated his position as follows:

> Your honor, and if I'm wrong, please quote me that I am wrong. To me, it sounds like I'm taking a guilty plea to trial. I know it's my right to present a defense of innocence, I believe, the Sixth Amendment. And ah, I talked to [defense counsel] about that continually. And I do understand the circumstances of the case before me, but that's it.

Appellant's trial attorneys objected, contending that the evidence warranted an EED defense and that presenting such a defense was in Appellant's best interests, given the substantial evidence of his guilt. Defense counsel presented testimony from a clinical psychotherapist, David Kegel, who opined that Appellant was not psychotic but had certain "personality limitations" that prevented him from making wise choices. The trial judge granted Appellant's motion, finding that he had "voluntarily and intelligently" exercised his right not to present an EED defense.

During voir dire, defense counsel did not mention EED as a defense but questioned jurors whether, if they convicted Appellant, they could consider EED as a mitigating circumstance in fixing a penalty. Appellant objected to any voir dire on EED as a mitigating circumstance claiming that such questioning impaired his defense of innocence even though it might be helpful to his sentence. Appellant then moved to either strike every juror who had been questioned about EED as a mitigating circumstance or to have the trial court instruct each juror that his attorney was not referring to him when asking such questions. The trial judge denied Appellant's motion, explaining that he had authorized defense counsel to question jurors about their abilities to consider mitigating circumstances during the penalty phase of the trial.

At the conclusion of the guilt phase evidence, Appellant requested against the advice of defense counsel that he be permitted to make his own closing argument. The trial court denied the request as untimely and because he feared Appellant, who did not testify during the trial, would attempt during closing argument to introduce unsworn testimony about matters not in evidence and not subject to cross-examination. Defense counsel presented the guilt phase closing argument. Finally, at the conclusion of the penalty phase evidence, the trial judge ruled that defense counsel could, in his penalty phase argument, attempt to persuade the jury to mitigate Appellant's sentences because the crimes were committed while he was under the influence of EED.

## A. EED as a defense.

Appellant claims that despite his waiver of the EED defense, the trial court erred by refusing defense counsel's tendered guilt phase instructions that would have included the absence of EED as an element of the offense of murder and an instruction on manslaughter in the first degree as a lesser included offense. The trial court refused the tendered instructions because of Appellant's prior waiver of the defense.

 EED is a defense to the crime of murder. *Coffey v. Messer,* Ky., 945 S.W.2d 944, 945–46 (1997). The whole thrust of Appellant's *Jacobs* argument was that he did not wish to assert EED as a defense because it would impair his defense of innocence—and the trial court found, per *Jacobs,* that Appellant's decision was voluntarily and intelligently made. Thus, instructing the jury on the defense of EED would have violated Appellant's right to control his defense. Furthermore, pursuant to Appellant's waiver, no evidence had been introduced that would justify the tendered instructions, *i.e.,* no evidence of uninterrupted EED from a "triggering event" to the killings, *Caudill, supra,* at 667–68; *Fields v. Commonwealth,* Ky., 44 S.W.3d 355, 357–59 (2001); *Springer v. Commonwealth,* 998 S.W.2d at 452–53, and no evidence of a

"reasonable explanation or excuse" for Appellant to become so enraged, inflamed, or disturbed as to cause him to kill the Porters. KRS 507.020(1); *McClellan v. Commonwealth*, Ky., 715 S.W.2d 464, 468–69 (1986). The trial court correctly refused to give the tendered instructions.

*B. EED as a mitigating circumstance.*

 Encompassed within a defendant's constitutional right to effective assistance of counsel is the right to waive such assistance and proceed *pro se*. *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562 (1975); *Wake v. Barker*, Ky., 514 S.W.2d 692, 697 (1974). The foundation of this entitlement is the right of the defendant to control his defense and be the "pilot of the ship." *Jacobs, supra*, at 417–18; *see also Faretta, supra*, at 819–20, 95 S.Ct. at 2533 ("The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.").

In *Jacobs, supra*, we held that the trial court violated the defendant's right to control his own defense by permitting defense counsel, over the defendant's objection, to present an insanity defense. *Id.* at 417–18. "Neither counsel nor the court has the power to contravene a defendant's voluntary and intelligent decision to forego an insanity defense." *Id.* at 418. Appellant argues that he is entitled to a new trial because this same principle should have precluded defense counsel from inquiring of prospective jurors during voir dire as to whether they could consider EED as a mitigating circumstance and arguing EED as a mitigating circumstance during the penalty phase of his trial. We disagree.

The premise of *Jacobs, supra*, is that a defendant's constitutional right to control his defense includes the right to waive the assertion of any defense inconsistent with his claim of innocence. *Id.* at 418. *Jacobs* did not address whether that holding extended to a waiver of mitigating evidence during the penalty phase of the trial. At that point, the issue of innocence has been resolved unfavorably to the defendant and the only remaining issue is the degree of punishment to be imposed. Appellant did not object to the instruction on EED as a mitigating circumstance but only to defense counsel's assertion of it during closing argument—positions that were inherently inconsistent.

The United States Supreme Court has yet to address this particular issue; however, many jurisdictions have upheld a defendant's right to voluntarily and intelligently waive the presentation of mitigating evidence. *E.g., United States v. Davis*, 285 F.3d 378, 381 (5th Cir.2002), *cert. denied*, 537 U.S. 1066, 123 S.Ct. 618, 154 L.Ed.2d 555 (2002); *Singleton v. Lockhart*, 962 F.2d 1315, 1322 (8th Cir.1992); *Silagy v. Peters*, 905 F.2d 986, 1008 (7th Cir. 1990); *Nelson v. State*, 681 So.2d 252, 255 (Ala.Crim.App.1995); *People v. Bloom*, 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698, 715 (1989); *Hamblen v. State*, 527 So.2d 800, 804 (Fla.1988); *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879, 906 (2001); *Colwell v. State*, 112 Nev. 807, 919 P.2d 403, 406 (1996); *State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, 1236–37 (1999); *State v. Arguelles*, 63 P.3d 731, 753 (Utah 2003) ("[A] defendant's Sixth Amendment right to represent himself and control the course of the proceedings carries with it the right to choose how much—if any—mitigating evidence is offered."). The majority of these cases, however, were decided in the context of a convicted defendant's claim that he or she was improperly permitted to waive the right to have the jury consider mitigating circumstances.

*Singleton, supra,* at 1321–22 (defense counsel had no obligation to override defendant's knowing and voluntary waiver of right to present mitigating evidence); *Silagy, supra,* at 1008 (not abuse of discretion to grant competent defendant's midtrial motion for self-representation when purpose of motion was to forego presentation of mitigating evidence and seek the death penalty); *Bloom, supra,* at 713 (same); *Grim v. State,* 841 So.2d 455, 461 (Fla.2003) (trial court not required to appoint special counsel for purposes of presenting mitigating evidence if defendant knowingly and voluntarily waived the presentation of such evidence); *Dunster, supra,* at 906 (same); *Colwell, supra,* at 406 (same); *Ashworth, supra,* at 1237 ("[Defendant] was competent to waive the presentation of mitigation and ... cannot now rescind that waiver and argue that he is entitled to a new penalty phase because he changed his mind."); *Wallace v. State,* 893 P.2d 504, 511–12 (Okla.Crim.App.1995) (affirming where defendant openly sought death penalty and chose to present no mitigating evidence). The issue has also been addressed in the context of a claim that the attorney's compliance with the defendant's knowing and voluntary decision not to present mitigating evidence amounted to ineffective assistance of counsel. *Zagorski v. State,* 983 S.W.2d 654, 657–59 (Tenn.1998).

We find only one case holding that it was error for the trial court to permit the presentation of mitigating evidence over the defendant's objection. In *United States v. Davis, supra,* the defendant advised the trial court prior to the penalty phase of his trial that he wished to proceed *pro se* and to present no mitigating evidence, stating that he would maintain his innocence. When the trial court declined to permit that strategy, the United States Court of Appeals for the Fifth Circuit issued a writ of mandamus recognizing the defendant's right to self-representation during the penalty phase. When the trial court then appointed independent counsel to present mitigating evidence on the defendant's behalf, the Court of Appeals issued a second writ prohibiting the appointment of counsel over the defendant's objection, holding that such violated the defendant's right to self-representation under *Faretta. Id.* at 381.

▮▮▮▮ *Davis,* is distinguishable from the case *sub judice* in that Appellant never asserted his right to self-representation or expressed a desire to proceed *pro se.* The denial of a defendant's right to self-representation is a "structural error" not subject to harmless error analysis. *McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 950 n. 8, 79 L.Ed.2d 122 (1984) ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless."). However, the denial of the right to waive mitigating factors after a finding of guilt does not increase the likelihood of an "outcome unfavorable to the defendant" but rather increases the likelihood that a defendant will avoid the death penalty and receive a lesser sentence. Thus, such denial is not a "structural defect affecting the framework within which the trial proceeds." *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991); *see also Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) ("structural defects" are errors involving basic protections without which "a criminal trial cannot reliably serve its function as a

*vehicle for determination of guilt or innocence"* (emphasis added)). Further, the right to waive mitigating circumstances during the penalty phase of a trial is inherently different from the right to waive a defense inconsistent with a claim of innocence during the guilt phase. Although Appellant claims a reputational interest in maintaining his innocence, he fails to show how his ultimate sentence was prejudiced by counsel's argument urging the jury to impose a lesser penalty because of mitigating circumstances.

■ Nor was Appellant's defense of innocence prejudiced by defense counsel's inquiry during voir dire as to whether prospective jurors could consider EED as a mitigating circumstance. The inquiry occurred during the "death qualification" of the prospective jurors, an aspect of voir dire that necessarily required the jury to hypothetically assume guilt, and was included within defense counsel's inquiry with respect to the attitudes of prospective jurors with respect to various mitigating circumstances. Defense counsel did not assert during voir dire that Appellant committed the offenses while acting under the influence of EED but only inquired whether the jurors could consider EED as a mitigating circumstance in the event of a finding of guilt.

### C. Closing argument.

■ *Wake v. Barker, supra,* holds that a defendant may "make a limited waiver of counsel, specifying the extent of services he desires." *Id.* at 696. If the defendant makes such waiver knowingly and voluntarily, counsel's duties are "confined to rendering the specified kind of services (within, of course, the normal scope of counsel services)." *Id.* However, a defendant who wishes to waive his con-

stitutional right to counsel (or, as here, make a limited waiver) must do so in a timely manner so as not to cause a delay in the proceedings. *Robards v. Rees,* 789 F.2d 379, 383–84 (6th Cir.1986). *See also Faretta, supra,* at 835, 95 S.Ct. at 2541 (defendant "clearly and unequivocally" made his request to forego counsel weeks before trial); *United States v. McKenna,* 327 F.3d 830, 844 (9th Cir.2003) ("A demand for self-representation is timely if made before meaningful trial proceedings have begun .... [A] request is timely if made before the jury is selected or before the jury is empaneled ...." (Quotation omitted.)); *United States v. Young,* 287 F.3d 1352, 1354–55 (11th Cir.2002) (defendant's request to proceed *pro se* properly denied when request was made after jury selection). The trial court may, of course, grant an untimely request but that is a decision lying within its sound discretion. *Robards, supra,* at 384. Here, Appellant did not request to make his own closing argument until the conclusion of the guilt phase of the trial. He never specifically asserted his right to self-representation or to proceed *pro se.* He simply expressed a desire to make his own closing argument. Further, since Appellant had not testified during the trial, the trial judge was legitimately concerned that he might use his closing argument to present unsworn testimony. *See Garrett v. Commonwealth,* Ky., 48 S.W.3d 6, 16 (2001) (closing argument may not be used to "argue facts that are not in evidence or reasonably inferable from the evidence" (citations omitted)). The denial of Appellant's belated request to make his own closing argument was not an abuse of discretion.

### VII. EVIDENCE ISSUES.

*A. Other crimes, wrongs, or acts. KRE 404(b).*

### 1. 1996 Burglary charge.

Appellant claims it was reversible error (1) to admit evidence of his 1996 burglary charge in violation of KRE 404(b); (2) to deny his motion to give a limiting admonition to the jury with respect to that evidence in violation of KRE 105; and (3) to admit the evidence despite the Commonwealth's failure to give adequate notice of its intent to do so in violation of KRE 404(c).

The issue pertains to the criminal complaint charging Appellant with the August 1996 burglary of the Porter residence. As explained, *supra*, the Oldham District Court dismissed the charge without prejudice subject to certain conditions, including "no contact with the CW [complaining witness]." On August 23, 1999, the Commonwealth filed written notice of its intent to rely on the aggravating circumstance that Appellant "murdered the victims while there was in effect an order by the Oldham District Court designed to protect the victims from [Appellant]." KRS 532.025(2)(a)(8). Appellant subsequently filed a motion *in limine* that the trial court instruct the Commonwealth to admonish its witnesses not to refer to "inadmissible and unduly prejudicial matters," including Appellant's "prior convictions or charges or sentences." After a pre-trial hearing, the trial court overruled the motion in part, permitting the Commonwealth to introduce evidence of the aforementioned court order and its conditions but prohibiting the Commonwealth from referring to the dismissed charge as either a burglary or a felony.

On three occasions during the trial, the Commonwealth introduced evidence relating to the district court order. First, Officer Ted Speigel of the Oldham County Police Department testified that Armotta told him when he arrived at the Porter residence that Appellant had shot her and that he had previously been arrested on other charges. Second, the Commonwealth introduced a certified copy of the 1996 district court order which was redacted to delete the nature of the charge and that it was a felony. Third, Armotta testified that her father had previously sworn out a criminal complaint against Appellant and that Appellant had agreed to certain conditions in exchange for the dismissal of the charges. Thus, there was no violation of the *in limine* order with respect to any of this evidence.

The evidence was probative of Appellant's motive in murdering Mr. and Mrs. Porter and attempting to murder Armotta. Evidence of prior misconduct that shows a motive to commit the subsequent offense is admissible under KRE 404(b)(1). *Brown v. Commonwealth*, Ky., 983 S.W.2d 513, 516 (1999) (evidence of defendant's prior indictment for flagrant nonsupport admissible as proof of motive to murder his wife); *McCarthy v. Commonwealth*, Ky., 867 S.W.2d 469, 470 (1993) (evidence that defendant was subject to emergency protective order issued at the behest of his estranged wife admissible "as evidence of motive or state of mind" of defendant charged with assaulting estranged wife and burglarizing her home), *overruled on other grounds by Lawson v. Commonwealth*, Ky., 53 S.W.3d 534, 544 (2001); *Matthews v. Commonwealth*, Ky., 709 S.W.2d 414, 418 (1985) (evidence that estranged wife sought and obtained warrant charging defendant with sexual abuse of step-daughter resulting in the issuance of "no-contact" order admissible to prove motive for subsequent murder of estranged wife).

The fact that the order was entered over two years prior to the charged

offenses did not bar its admission. "Temporal remoteness generally is held to go to the weight of the evidence, but not to render it inadmissible *per se.*" *Commonwealth v. English,* Ky., 993 S.W.2d 941, 944 (1999) (citations omitted). Rather, temporal remoteness is but one factor to be weighed under KRE 403. *Id.* at 945. The KRE 403 analysis, of course, is committed to the sound discretion of the trial judge and is reviewed only for abuse of discretion. *Id.* Here, the probative value of the district court order as evidence of Appellant's animus against the Porters was heightened by the fact that Appellant's last contact with the Porters before June 29, 1999, was the day the "no contact" order was entered. Thus, this evidence was highly probative of Appellant's motive and its admission was not an abuse of discretion.

 After the trial court overruled his objection to Speigel's testimony, Appellant asked for a limiting admonition. The request was denied without explanation. While this was error, KRE 105(a), it is subject to harmless error analysis. *Epperson v. Commonwealth,* Ky., 809 S.W.2d 835, 838 (1990). Considering the overwhelming evidence of Appellant's guilt and the limited prejudicial effect of this evidence outside of its legitimate purpose to prove motive, the failure to give the limiting admonition was harmless beyond a reasonable doubt.

Appellant also asserts that the Commonwealth failed to provide him with written notice of its intent to introduce the evidence as required by KRE 403(c). However, there is no requirement that such notice be in writing. *Tamme,* 973 S.W.2d at 31–32. KRE 404(c) is satisfied if the accused is provided "with an opportunity to challenge the admissibility of this evidence through a motion *in limine* and to deal with reliability and prejudice problems at trial." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.25 (3rd ed.1993). Obviously, Appellant had actual notice since he filed a motion *in limine* to suppress the evidence. *Tamme, supra,* at 31–32.

*2. Termination of Appellant's employment and failure to return weapon.*

Ed Davis, the manager of Diamond Detective Agency and Appellant's former supervisor, testified that he hired Appellant to work as a security guard in April 1999 and provided him with a .38 caliber revolver, serial number 2D59496, which was later identified as the same weapon used to kill Mr. and Mrs. Porter. Davis further testified that he terminated Appellant's employment and thereafter made repeated unsuccessful efforts to obtain the return of the revolver, including the sending of a certified letter to Appellant. Appellant claims that this was improper "character evidence" under KRE 404(b).

We note at the outset that this issue was specifically waived. Before the Commonwealth called Davis to testify, Appellant objected to any testimony from Davis regarding a subsequent civil suit and criminal charge that he filed against Appellant because of the failure to return the weapon. However, Appellant specifically stated that he *did not* object to Davis's testimony regarding his failure to return the weapon after the termination of his employment. The prosecutor instructed Davis not to mention the civil suit and criminal charge, and Davis complied with that instruction.

 Nevertheless, the fact that Appellant failed to return the .38 revolver upon the termination of his employment was relevant to identify the weapon as the one

used to kill Mr. and Mrs. Porter and to link it to Appellant, thus identifying Appellant as the perpetrator of the murders. *See Barth v. Commonwealth,* Ky., 80 S.W.3d 390, 402–03 (2001) (evidence that defendant flourished weapon on another occasion before using it in assault and robbery admissible under KRE 404(b)(1) as probative of identity of the weapon and of defendant as perpetrator). Davis's testimony with respect to his unsuccessful attempts to retrieve the weapon was relevant for the same purpose, *i.e.,* to show that the weapon was in Appellant's, not Davis's, possession at the time the crimes were committed. Evidence that Davis terminated Appellant's employment was "inextricably intertwined" with the evidence of his unsuccessful attempts to obtain the return of the weapon. KRE 404(b)(2).

Nor was there a KRE 404(c) violation with respect to Davis's testimony. Appellant made a preliminary objection resulting in the exclusion of certain aspects of Davis's testimony, *i.e.,* that he had sued Appellant and brought criminal charges against him for failing to return the weapon, indicating prior actual knowledge of the substance of that testimony.

### B. *Hearsay.*

#### 1. *Excited utterances.*

Becky Gilbert, a 911 operator with Oldham County Central Dispatch, testified that on June 29, 1999, she received a 911 call from an unidentified female who told her only that she had been shot in the back and knee by Miguel Soto and the address from which she was calling—the address of the Porter residence. Gilbert terminated the conversation and dispatched emergency vehicles to the Porter residence. She then obtained and dialed the Porter's telephone number. The per-

son who answered identified herself as Armotta Porter, and Gilbert recognized her voice as that of the same person who made the previous 911 call. A recording of both conversations was played at trial. Appellant first claims that both conversations were inadmissible hearsay. We conclude that the conversations were within the "excited utterance" exception to the hearsay rule. KRE 803(2).

An "excited utterance" is a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* The eight "most significant" factors used to determine whether a statement is an excited utterance are:

> (i) lapse of time between the main act and the declaration, (ii) the opportunity or likelihood of fabrication, (iii) the inducement to fabrication, (iv) the actual excitement of the declarant, (v) the place of the declaration, (vi) the presence there of visible results of the act or occurrence to which the utterance relates, (vii) whether the utterance was made in response to a question, and (viii) whether the declaration was against interest or self-serving.

*Jarvis v. Commonwealth,* Ky., 960 S.W.2d 466, 470 (1998) (citation omitted). These criteria serve only as a guideline for admissibility and are not a bright-line test. *Id.* The trial court did not err in finding that Armotta's statements to Gilbert were excited utterances. Armotta called the 911 operator immediately after being shot, with little time for reflection or deliberation. The tone of her voice on the 911 recording indicates that she was distraught, in substantial pain, and extremely excited. She had little inducement to fabricate as she was seeking police protec-

tion from her attacker and medical attention for her wounds. Her identification of Appellant as her assailant was spontaneous and not in response to an inquiry. *See Wells v. Commonwealth*, Ky., 892 S.W.2d 299, 302 (1995) (statements made by stabbing victim to 911 operator and treating EMT made within minutes of stabbing properly admitted as excited utterances).

At approximately 6:30 p.m., Speigel arrived at the Porter residence in response to the 911 call. Speigel testified that he found Armotta standing in the doorway, bleeding from the abdomen, and holding her infant daughter. Armotta told him that her ex-husband had shot her while they were in the garage, that he had said he had killed her parents,[5] and that she did not know where he was. These statements were admissible as excited utterances for the same reasons as the statements made during the 911 call. *Robey v. Commonwealth*, Ky., 943 S.W.2d 616, 618–19 (1997) (statements made by rape victim minutes after rape occurred admissible as excited utterances); *Wells, supra*, at 302; *Dawson v. Commonwealth*, Ky.App., 867 S.W.2d 493, 496 (1993) (assault victim's statements to police officer who arrived five minutes after assault admissible as excited utterances); *cf. Curtis v. Commonwealth*, Ky., 474 S.W.2d 394, 396 (1971) (statements by victim to police officers who arrived at victim's home approximately thirty minutes after shooting admissible as *res gestae*).

### 2. DD Form 214.

 Renae Harrison had been married to Appellant for four years during which both were active duty members of the United States Army. She identified Appellant's signature on a document entitled "Certificate of Release or Discharge from Active Duty," otherwise known as a DD (Department of Defense) Form 214, purportedly issued on November 15, 1994, to Appellant (identifying him by name, date of birth, July 5, 1971, and social security number, 553–13–2137) and listing various awards and certifications earned by him, including a ".45 cal. sharpshooter badge" (the same type of weapon used to shoot Armotta). Appellant first asserts that the information contained in the DD Form 214 was inadmissible hearsay. However, a DD Form 214 is an official record of a public agency, 10 U.S.C. § 1168; 32 C.F.R. § 45.1, thus, its contents were admissible under the public records exception to the hearsay rule. KRE 803(8).

### 3. Hearsay objections sustained.

Detective Randy Blanco was the chief investigator of the crime scene. When asked by the prosecutor to summarize the steps he took during his investigation, Bianco testified, *inter alia*, that Hoskins told him that Appellant was the person mentioned in the 911 call and that he had "turned himself in." Bianco further testified that he contacted Speigel by cellular telephone and was advised that Armotta had told Speigel that Miguel Soto had shot her in the back from a distance of approximately four feet.

 Appellant objected to this testimony as hearsay and the trial judge sustained the objection. Appellant did not request an admonition to the jury to disregard the evidence; thus, no error occurred. *Tamme, supra*, at 35; *Hayes v.*

---

[5] Appellant's admission to Armotta that he killed her parents was separately admissible under KRE 801A(b)(1).

*Commonwealth,* Ky., 698 S.W.2d 827, 829 (1985) ("Merely voicing an objection, without a request for a mistrial or at least for an admonition, is not sufficient to establish error once the objection is sustained."). Absent countervailing evidence, the failure to request a limiting admonition is regarded as a trial tactic, *Sanders,* 801 S.W.2d at 668, intended to avoid calling further attention to the improper evidence. *See also Caudill,* 120 S.W.3d at 658; *Hall v. Commonwealth,* Ky., 817 S.W.2d 228, 229 (1991), *overruled on other grounds by Commonwealth v. Ramsey,* Ky., 920 S.W.2d 526, 527 (1996).

### 4. Harmless hearsay.

■■■ Roxanne Fisher, Armotta's older sister and Mr. and Mrs. Porter's eldest daughter, testified that she telephoned her parents at their home at approximately 5:10 p.m. on the evening of their murders and spoke to both of them over the course of approximately twenty minutes. She testified that her father told her that they had recently arrived home from the doctor's office. We agree that the statement was hearsay, *Slaven v. Commonwealth,* Ky., 962 S.W.2d 845, 854 (1997), but conclude that it was harmless beyond a reasonable doubt. Appellant claims the jury could have inferred from this statement that Appellant arrived at the Porter property before Mr. and Mrs. Porter returned home and lay in wait for them like a stalking animal. If so, the inference was no more prejudicial than Appellant's admission during his recorded confession that he, in fact, hid in the tool shed and killed Mr. Porter when he unsuspectingly entered it.

### C. Authentication.

### 1. 911 call.

■■■ The recording of the 911 call from Armotta to Gilbert was properly au-

thenticated. A party may authenticate a telephone conversation:

> [B]y evidence that a call was made to the number assigned at the time by the telephone company to a particular place or business if:
>
> A) In the case of a person, circumstances, including self-identification, show the person answering to be the one called;

KRE 901(b)(6)(A). Here, as in *Crowe v. Commonwealth,* Ky., 38 S.W.3d 379 (2001), the initial conversation was by way of an incoming call to a person who could not identify the caller by voice recognition. *Crowe* held that KRE 901(b)(6)(A) does not apply to incoming telephone calls and that mere self-identification by the caller is insufficient to identify the caller. *Id.* at 383. "Identification of a party to an *incoming* telephone call is authenticated if the recipient of the call recognizes the voice of the caller *or is otherwise able to connect the voice with the caller.*" *Id.* (emphasis added). However, when Gilbert made the return call to the telephone number listed for the address given to her by the initial caller and the same person answered and identified herself, such was sufficient to identify Armotta as both the initial caller and the recipient of the return call. *See Osborne v. Commonwealth,* Ky., 43 S.W.3d 234, 242 n. 3 (2001) (911 call from defendant's mother properly authenticated where operator made return call to number provided by mother and same person answered).

### 2. DD Form 214.

■■■ Appellant's DD Form 214 was properly authenticated despite the fact that it was neither certified nor attested and was not introduced by the custodian of the record. As an official record, the DD

Form 214 was self-authenticating under KRE 902(4), *viz:*

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
>
> . . .
>
> (4) Official records. An official record or an entry therein when admissible for any purpose, may be evidenced *by an official publication thereof* or by a copy attested by an official having the legal custody of the record. . . .

(Emphasis added.) The emphasized language means that a public record need not be further authenticated if the original document is introduced.[6] *Pa. State Police v. 139 Horseshoe Corp.*, 157 Pa.Cmwlth. 283, 629 A.2d 290, 294 (1993).

■ A DD Form 214 is issued directly to the discharged servicemember or "his next of kin or legal representative." 10 U.S.C. § 1168. Harrison testified from her own personal experience as a discharged servicemember that the person to whom the DD Form 214 is issued is required to sign it upon receipt. The recipient may then record the document for safekeeping in the local county clerk's office. KRS 422.090(1). While different procedures would be required to authenticate a *copy* of the document, *see* KRS 422.090(2); KRE 902(4), the only authentication required of the original is evidence sufficient to prove that it is, in fact, the original document. KRE 901(a). The document in question is obviously an original and not a copy. Its identification of

Appellant by name, date of birth, and social security number, accompanied by Harrison's identification of his signature on the document, sufficed to identify it as the original DD Form 214 issued to Appellant upon his discharge from the United States Army.

### 3. *Dumpster documents.*

Detective Larry Congelton of the Oldham County Police Department testified that he searched a dumpster located in the parking lot of the Crestwood Recruiting Station where Appellant had parked his automobile on June 29, 1999, before proceeding on foot to the Porter residence. The search produced a number of documents that appeared to belong to Appellant, including various military records containing Appellant's name and social security number, as well as two original documents purportedly prepared by Appellant, himself. These latter two documents were admitted into evidence over Appellant's objection that they were not properly authenticated as having been authored by him.

The first document, typewritten except for a signature purporting to be that of Appellant and Appellant's handwritten social security number, reads as follows:

> I, Miguel Angel Soto, being of mind sound and body, hereby writes [sic] my last will and testimony. To my oldest daughter, Kristie Denae Soto, I leave all my personal belongings. For all three of my daughters, Kristie Denae Soto, Kaylynn Michelle Soto, and Brianna Nicole Porter, I leave any benefits acquired from the military.

---

**6.** Kentucky did not adopt Fed. R. Ev. (FRE) 902(4) which does not contain the "official publication" language, perhaps because it could be assumed that the Rule applied only to copies. In adopting the Kentucky Rules of Evidence, we instead retained the language of Ky. R. Civ. Proc. (CR) 44.01.

/s/ Miguel Angel Soto

553132137

The second document, typewritten and unsigned, was partially redacted to delete a reference to a prior criminal offense for which Appellant was convicted in 1996 in Jeffersonville, Clark County, Indiana. The document begins as follows:

Hello everyone.

My name is Miguel Angel Soto, also known as Mickey to my friends or SO-TOPOP to all my internet friends. This letter is a final goodbye to all that believed in my dreams of getting back into the lives of my children.

The author then expresses frustration over not having custody of the children and blames unidentified ex-wives for that fact. The document continues:

I had a list of all the people that I planned on destroying, but I knew that I would only be able to Take [sic] care of one person, so I drew a name out of the hat, you all know who won. The following names are the lucky non winners, I hope they live their lives better, knowing that they have a second chance:

The document then lists the "lucky non winners" as Renae Harrison, Richard Paul Harrison, and Linda Kay Harrison, Armott Porter and Edna Porter, two members of the Clark County, Indiana, Sheriff's Department, and a former Clark County, Indiana, prosecutor. The document concludes:

I do love my daughters, Kristie, Kaylynn and Brianna, but if I cannot be part of their lives, then I don't want to be living on this planet. God knows what I've been through, so that is why I am not scared. Goodbye all and I will see you all in a better place.

Of course, conspicuously absent from the list of "lucky non winners" was the name of Armotta Porter, damning evidence of Appellant's premeditated intent to kill her.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(a). Appellant asserts that the provisions of KRE 901(b), titled "Illustrations," required the Commonwealth to produce evidence that Appellant's signature on the "last will" was genuine. He theorizes that KRE 901(b)(2), which allows a party to authenticate a document by non-expert opinion as to the genuineness of the handwriting, and KRE 901(b)(3), which allows authentication through "[c]omparison by the trier of fact or by expert witnesses with specimens which have been authenticated," are the only methods by which these documents can be authenticated. He is mistaken.

While KRE 901(b)(2) and (3) indeed describe methods by which a document may be authenticated, those methods are not exclusive. "The specific illustrations [of KRE 901(b) ] are not to be viewed as all-inclusive." Lawson, *supra*, at § 7.05. In the absence of direct evidence as to a writing's authenticity, a document may be authenticated by a wide variety of means, including circumstantial evidence. *See Fanelli v. Commonwealth*, Ky., 418 S.W.2d 740, 744–45 (1967) (circumstantial evidence sufficient to authenticate checks allegedly signed by defendants, even absent testimony from handwriting experts or persons familiar with defendants' signatures); Lawson, *supra*, at § 7.05 ("[T]here is no end to the ways in which the circumstances surrounding a writing might tend to show authenticity."). In addition, dis-

tinctive characteristics of the writing, in conjunction with the circumstances, may assist in its authentication. KRE 901(b)(4) ("Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances"); *Lawson, supra,* at § 7.05; *see also United States v. Wilson,* 532 F.2d 641, 644 (8th Cir.1976) ("Under [FRE 901(b)(4) ], the contents of a writing may be used to aid in determining the identity of the declarant.").

■ Both documents were found at a location where Appellant was known to have been just prior to the murders and were found along with other military documents containing Appellant's name, date of birth, and social security number. Both documents identified Appellant's children by name. Both evidenced a belief in the writer's pending demise, a fact corresponding to Appellant's having discarded most of his personal effects because he would not need them "where he was going." The "last will" contained Appellant's purported signature and handwritten social security number, and made reference to his military service. The "final goodbye" described events that occurred in Appellant's life, including his lack of visitation with his children and his 1996 conviction in Jeffersonville, Indiana. The "lucky non winner's list" included persons connected to Appellant's past, *i.e.,* an ex-wife, former in-laws, arresting officers, and a former prosecutor. Specifically, it included the two persons Appellant was accused of murdering. This circumstantial evidence sufficed to identify Appellant as the author of both documents.

### D. Rule of Completeness.

Monica Nahand testified that Appellant lived with her and her three children in Jeffersonville, Indiana, until she asked him to leave on June 26, 1999. During that period, Appellant told Nahand that he was writing a "story" that was handwritten on forty-three pages of a legal pad and asked if he could type it into her computer. She agreed, but Appellant did not finish the task. After Appellant moved out of her residence, Nahand found pages fourteen through forty-three of the handwritten "story" in her house. The first thirteen pages had been torn out of the legal pad. After the Porter murders, Nahand delivered the remainder of the legal pad to the police. She disclaimed any knowledge of the fate of the first thirteen pages.

At trial, Nahand identified Appellant's handwriting on page forty-three, and that page was admitted as evidence of Appellant's animus against Armotta. It described a scenario in which "Armotta had walked into her bedroom, grabbed the .357 magnum that her father had given her for protection and done [sic] something that she nearly forced Miguel to do 3 times. She placed the muzzle to her left temple, and pulled the trigger." Appellant claims that the admission of page forty-three violated KRE 106, the so-called "rule of completeness," because the first thirteen pages of his "story" were missing, thus depriving him of the opportunity to introduce the complete document.

■ KRE 106 provides that when a party introduces a portion of a writing or recorded statement, the adverse party may "require the introduction at that time of any other part ... which ought in fairness to be considered contemporaneously with it." KRE 106 is a rule of admission, not exclusion. It allows a party to introduce the remainder of a statement offered by an adverse party for the purpose of putting the statement in its proper context

and avoiding a misleading impression from an incomplete document. Lawson, *supra*, at § 1.20 ("The objective of [KRE 106], in other words, is to prevent a misleading impression as a result of an incomplete reproduction of a statement or document."). It does not require the exclusion of a relevant portion of a document because other portions cannot be found. Furthermore, even if the entire document were available, KRE 106 would require the admission of only that portion which concerns the part introduced by the adverse party. *Young v. Commonwealth*, Ky., 50 S.W.3d 148, 169 (2001). *See also United States v. Littwin*, 338 F.2d 141, 146 (6th Cir.1964) (rule of completeness "is subject to the qualification that only the other parts of the document which are relevant and throw light upon the parts already admitted become competent upon its introduction. There is no rule that either the whole document, or no part of it, is competent." (Citations omitted.)). The real issue is whether the excluded portion alters the portion already introduced. *Young, supra*, at 169; *Commonwealth v. Collins*, Ky., 933 S.W.2d 811, 814 (1996). Appellant (who authored the missing pages) does not suggest how the missing pages would have altered the portion that was introduced. Thus, there was no violation of KRE 106.

### E. Relevancy.

#### 1. Testimony of Renae Harrison.

■ In addition to identifying Appellant's signature on the DD Form 214, Harrison testified that she and Appellant had two daughters, Kristie, then age eight, and Kaylynn, then age six, whom Appellant had not seen since November 1995. Appellant challenges the relevancy of this evidence; however, proof that Appellant had two children named Kristie and Kaylynn Soto and that he had not seen them since 1995 was relevant to the authentication of the "last will" and "final goodbye" documents, *supra*. Unlike Appellant, we are unable to conclude that the jury must have inferred some sinister connection from the fact that Appellant's last visit with his older children coincided with his separation from Armotta.

#### 2. Testimony of David Poussant.

■ In April 1999, three months before the murders, David Poussant was a military policeman stationed with Appellant at Fort Knox, Kentucky. He was acquainted with both Appellant and his ex-wife, Harrison. Poussant testified that Appellant told him that he loved his children and "would do anything to get them back," and, on another occasion, to pray for him and not to be "surprised if you see me in the news sometime." Appellant challenges Poussant's testimony as irrelevant. However, the statements, when considered in conjunction with the previously admitted "story" and "list of lucky non winners," were probative of the Commonwealth's theory that Appellant intended to kill Armotta in revenge for denying him visitation with Brianna.

#### 3. Humanizing evidence.

■ Appellant recites numerous complaints regarding the claimed irrelevancy of evidence that "humanized" the victims and described the horrific nature of their injuries. "We have stated many times that evidence that a murder victim was not a mere statistic but an individual human being with a personality and activities does not unduly prejudice the defendant or inflame the jury." *Caudill*, 120 S.W.3d at 662 (citations omitted); *see also Adkins v.*

*Commonwealth,* Ky., 96 S.W.3d 779, 794 (2003); *Stopher v. Commonwealth,* Ky., 57 S.W.3d 787, 802–03 (2001); *Love v. Commonwealth,* Ky., 55 S.W.3d 816, 827 (2001); *Hodge,* 17 S.W.3d at 847; *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293, 302–03 (1997). Further, testimony describing the nature of the wounds and the cause of death or injury is relevant to prove the *corpus delicti. Caudill, supra,* at 659. Armotta's testimony regarding her life experiences, employment, and family leading up to the events of June 29, 1999, was also relevant background evidence. The trial court did not abuse its discretion in admitting this evidence. KRE 403; *English,* 993 S.W.2d at 945 (citations omitted).

## VIII. GUILT PHASE INSTRUCTIONS.

In addition to the failure to instruct on EED and manslaughter in the first degree, discussed in Part VI of this opinion, *supra,* Appellant asserts that the trial court erred in not instructing the jury on wanton murder as an alternative to intentional murder and on second-degree manslaughter and second-degree assault as lesser included offenses.

### A. Wanton Murder.

A person commits wanton murder when "under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." KRS 507.020(1)(b). An instruction on wanton murder has been held appropriate where there was evidence that the defendant fired a weapon at the victim but without an intent to kill. *Carwile v. Commonwealth,* Ky., 656 S.W.2d 722, 723–24 (1983). However, a

theory unsupported by the evidence is not entitled to an instruction. *Pilon v. Commonwealth,* Ky., 544 S.W.2d 228, 231 (1976). There was no evidence that Appellant shot either Mr. or Mrs. Porter without an intent to kill. Both were shot twice at close range and Appellant did not claim in his confession that he did not intend to kill them.

### B. Manslaughter in the second degree and assault in the second degree.

Appellant asserts that he was entitled to an instruction on manslaughter in the second degree as a lesser included offense of murder and on assault in the second degree as a lesser included offense of attempted murder because the jury could have believed that he was so intoxicated that he did not form the requisite intent to commit the charged offenses. Evidence of voluntary intoxication does not serve to acquit the defendant, but if it negates the element of intent, reduces the offense to one having a *mens rea* of wantonness. *Caudill, supra,* at 669; *Slaven,* 962 S.W.2d at 856–57. An instruction on voluntary intoxication is warranted only when there is "evidence not only that the defendant was drunk, but that [he] was so drunk that *[he] did not know what [he] was doing.*" *Springer,* 998 S.W.2d at 439 (emphasis added) (citations omitted).

Appellant presented no evidence to satisfy that requirement. He cites his confession, in which he often changed the subject and once stated that he "got drunk." He also cites his urine test, which registered positive for PCP, cocaine, and amphetamines, and his blood test, which registered positive for diphenhydramine, an antihistamine. However, there was a plethora of evidence establishing that Appellant gave no indication of being intoxi-

cated and that he knew exactly what he was doing and no evidence to the contrary. He parked his car and walked three miles to the Porter residence. He hid in a tool shed to escape immediate detection. After shooting Mr. and Mrs. Porter, he concealed their bodies and the weapon used to kill them and lay in wait for Armotta. After shooting Armotta, he had the presence of mind to flee the scene and conceal the second weapon in a creek. He was able to find Mitch Nobles's residence, a place he had not visited for almost three years. These are not the actions of a man so intoxicated that he did not know what he was doing. *Compare Slaven, supra,* at 856–57 (evidence that defendant consumed "substantial quantities" of alcohol, Xanax, and marijuana, in addition to testimony that defendant was "wild and mumbling" and "pretty doped up" prior to the murder warranted instruction on second-degree manslaughter).

## IX. PENALTY PHASE ISSUES.

### A. *Aggravating circumstances.*

#### 1. *"No contact" order.*

Appellant asserts that his violation of the 1996 district court "no contact" order did not qualify as an aggravating circumstance under KRS 532.025(2)(a)(8).[7] He argues that the order was no longer "in effect" at the time of the murders. He is mistaken.

KRS 532.025(2)(a)(8) is a recent addition to the statutory list of aggravating circumstances, 1998 Ky. Acts, ch. 606, § 72, and applies when:

> The offender murdered the victim when an emergency protective order or a domestic violence order was in effect, *or*

> *when any other order designed to protect the victim from the offender, such as* an order issued as a condition of a bond, *conditional release,* probation, parole, or *pretrial diversion,* was in effect.

(Emphasis added.) This provision is not limited, as Appellant claims, to emergency protective orders and domestic violence orders. It is reasonable to assume that the "no contact" order in question was designed to protect Mr. Porter from retaliation by Appellant for causing him to be arrested for burglary. Thus, its violation fell within the parameters of KRS 532.025(2)(a)(8).

■ Appellant notes that a district court lacks the authority to make a final disposition of a felony charge. KRS 24A.110(1)(a); *Commonwealth v. Stephenson,* Ky., 82 S.W.3d 876, 887–88 (2002). However, the district court has *concurrent* jurisdiction with the circuit court to *examine* any felony charge and "to commit the defendant to jail or hold him to bail or other form of pretrial release." KRS 24A.110(3). This concurrent jurisdiction, of course, expires upon the issuance of an indictment by a grand jury, *Commonwealth v. Karnes,* Ky., 657 S.W.2d 583, 583–84 (1983), a circumstance that did not occur in this case. Further, because the district court order dismissed Appellant's charge "without prejudice," it did not finally dispose of it. There is no statute of limitations for a felony offense, KRS 500.050(1), and the charge could be refiled at any time that Appellant violated the conditions of dismissal. *Cf. Means v. Commonwealth,* 256 Ky. 30, 75 S.W.2d 546, 549 (1934) (indictment dismissed on condition that defendant leave the state properly reinstated upon nonperformance of that condition).

**7.** This aggravating circumstance was applied only to the murder of Mr. Porter.

Appellant cites KRS 533.020(4) for the proposition that a period of probation or conditional discharge of a misdemeanor expires after two years. Of course, (1) the charge was not a misdemeanor; and (2) it was neither probated nor conditionally discharged as Appellant was never convicted. We conclude that the "no contact" order had not expired and that the trial court correctly instructed the jury that a murder committed while violating that order was an aggravating circumstance authorizing capital punishment.

### 2. Burglary in the first degree.

Appellant asserts that the trial court improperly instructed the jury on the aggravating circumstance that he murdered Mr. Porter while engaged in the commission of burglary in the first degree. KRS 532.025(2)(a)(2). Appellant premises this argument on the fact that he killed Mr. Porter before entering the Porter residence, thus did not kill him while committing first-degree burglary.[8] KRS 511.020(1) provides:

(1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully *in a building*, and when in effecting entry or *while in the building* or in the immediate flight therefrom, he or another participant in the crime:

(a) Is armed with explosives or a deadly weapon; or

(b) Causes physical injury to any person who is not a participant in the crime; or

(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

(Emphasis added.) KRS 511.010(1) defines a "building" as follows:

"Building," *in addition to its ordinary meaning*, means any structure, vehicle, watercraft or aircraft;

(a) Where any person lives; or

(b) Where people assemble for purposes of business, government, education, religion, entertainment or public transportation.

. . .

(Emphasis added.) KRS 511.010(2) separately defines a "dwelling" as "a building which is usually occupied by a person lodging therein," indicating that "building" encompasses a broader category of structures than "dwelling." This conclusion is reinforced by the legislative history of KRS 511.020(1). As originally enacted, the statute provided that burglary in the first degree could be committed only by entering or remaining in a "dwelling" under the presently defined aggravating circumstances or at night. 1974 Ky. Acts, ch. 406, § 97. Entry into or remaining in a "building" under the presently defined aggravating circumstances constituted burglary in the second degree. 1974 Ky. Acts, ch. 406, § 98. The statute was amended in 1978 to provide that burglary in the first degree could be committed either by unlawfully entering or remaining in a "dwelling" with the intent to commit a crime therein, or by entering or remaining in a "building" under the presently defined aggravating circumstances. 1978 Ky. Acts, ch. 406, § 97. Finally, in 1980, unlawfully entering or remaining in a "dwell-

---

**8.** Appellant does not challenge the propriety of the aggravating circumstance with respect to the murder of Mrs. Porter.

ing" with the intent to commit a crime therein was redefined as burglary in the second degree, KRS 511.030(1), but entering or remaining in a "building" under the presently defined aggravating circumstances remained burglary in the first degree. 1980 Ky. Acts, ch. 376, §§ 2, 3.

■ Since burglary in the first degree does not require entering or remaining in a "dwelling," *e.g.*, the Porter residence, the inquiry becomes whether the tool shed in which Mr. Porter was murdered falls within the "ordinary meaning," KRS 511.010(1), of a "building." "[T]he first-degree burglary statute applies to every structure that meets the definition of a building as used in common parlance, without regard to whether it is inhabited or inhabitable." *Funk v. Commonwealth*, Ky., 842 S.W.2d 476, 482–83 (1992) (abandoned, condemned, and uninhabited building is a "building" for purposes of KRS 511.020(1)). The dictionary definition ("ordinary meaning") of "building" is:

> [A] constructed edifice designed to stand more or less permanently, covering a space of land, usually covered by a roof and more or less completely enclosed by walls, and serving as a dwelling, *storehouse*, factory, shelter for animals *or other useful structure*— distinguished from structures not designed for occupancy (as fences or monuments) and from structures not intended for use in one place (as boats or trailers) even though subject to occupancy.[9]

*Webster's Third New International Dictionary of the English Language Unabridged* 292 (Merriam–Webster 1993) (emphasis added).

---

**9.** Note that boats and trailers subject to occupancy would fall within the definition of a

■ There was evidence that Appellant unlawfully entered the tool shed and that he remained therein with the intent to commit a crime when he formulated the intent to kill Mr. Porter; and that while in the building, he was armed with a deadly weapon and caused physical injury to a person not a participant in the crime. Thus, he killed Mr. Porter while engaged in the commission of burglary in the first degree—even though it was not the same burglary of which he was separately convicted.

Even if Appellant were correct with respect to either of these aggravating circumstances, the error would be harmless because the jury also found the aggravating circumstance of multiple intentional deaths, KRS 532.025(2)(a)(6), which was unquestionably applicable to the murders of both Mr. and Mrs. Porter. *Barclay v. Florida*, 463 U.S. 939, 956, 103 S.Ct. 3418, 3428, 77 L.Ed.2d 1134 (1983); *Zant v. Stephens*, 462 U.S. 862, 884–89, 103 S.Ct. 2733, 2747–49, 77 L.Ed.2d 235 (1983); *Bevins v. Commonwealth*, Ky., 712 S.W.2d 932, 935–36 (1986).

*B. Other penalty phase instructions.*

*1. Mitigating circumstances—non-unanimity.*

■ "There is no requirement that a capital penalty jury be instructed that its findings on mitigation need not be unanimous." *Caudill, supra,* at 674–75; *Mills,* 996 S.W.2d at 492; *Tamme,* 973 S.W.2d at 37; *Bowling v. Commonwealth,* Ky., 873 S.W.2d 175, 180 (1993).

*2. Non-statutory mitigating circumstances.*

"building" in KRS 511.010(1).

Appellant asserts that the trial court erred by refusing to instruct the jury specifically with respect to each non-statutory mitigating circumstance claimed by Appellant, such as his deprived family background and military service. However, in addition to instructing on the applicable statutory mitigating circumstance, the trial court instructed the jury that it could consider "[a]ny other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value." Having so instructed the jury, the trial court was not required to give specific instructions regarding additional non-statutory mitigating circumstances claimed by Appellant. *Haight v. Commonwealth*, Ky., 938 S.W.2d 243, 248 (1996); *Bowling*, 873 S.W.2d at 180.

*3. Aggravating circumstances—unanimous verdict.*

Penalty phase instruction number 12 instructed the jury that:

> You must reach a separate verdict on each count described in these instructions and a separate verdict on your recommendation as to whether the sentence should run concurrently or consecutively. *Each verdict* must be in writing, *must be unanimous* and must be signed by one of you as foreperson.

(Emphasis added.) Verdict forms 6C, 6D, and 6E, as well as verdict forms 7C, 7D, and 7E, were provided for use by the jury if it found beyond a reasonable doubt that any of the three enumerated aggravating circumstances existed. It was not necessary that each verdict form also instruct the jury that the verdict written on that form must be unanimous. Instruction number 12 informed the jury of that requirement.

Further, the fact that instruction number 12 required that each verdict

be unanimous did not create "a substantial probability that reasonable jurors, upon receiving the judge's instructions ... well may have thought that they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills v. Maryland*, 486 U.S. 367, 384, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988). An instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991) (quotations omitted). The unanimity instruction specifically referred to each *verdict*. It did not instruct the jury that its *findings* must be unanimous or that it must reach a verdict on mitigating circumstances. *Compare Gall v. Parker*, 231 F.3d 265, 325–26 (6th Cir.2000) (trial court's instructions violated *Mills, supra*, by requiring jury's "*findings* and verdict" to be unanimous and requiring jurors to select "yes" or "no" as to existence of select mitigating factors) (emphasis added), *overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 (6th Cir.2003), *with Slaughter v. Parker*, 187 F.Supp.2d 755, 814–15 (W.D.Ky.2001) (distinguishing *Gall, supra*, and upholding instructions identical to those given in this case).

*4. Balancing of aggravating and mitigating circumstances.*

"The trial judge is not required to instruct the jury that aggravating circumstances must outweigh mitigating circumstances." *Hodge*, 17 S.W.3d at 854 (citations omitted); *see also Stopher*, 57 S.W.3d at 807; *Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 678 (1984).

*5. Concurrent/consecutive sentence recommendation.*

Appellant claims instruction number 12 and verdict form 12A, instructing the jury to *recommend* whether Appellant should serve his sentences concurrently or consecutively, denigrated the jury's responsibility in imposing the death penalty. *Tamme v. Commonwealth,* Ky., 759 S.W.2d 51, 53 (1988). However, the jury "fixed" Appellant's sentences in their other verdicts. KRS 532.055(2) specifically requires that the jury only "recommend" whether the sentences it has fixed should run concurrently or consecutively. Of course, a death sentence cannot run concurrently or consecutively with another sentence; thus, the recommendation would only apply to the murder convictions if the jury returned a verdict of a term of years, a circumstance that did not occur here.

■ Although *Foley v. Commonwealth,* Ky., 942 S.W.2d 876 (1996), held that KRS 532.055(2) does not apply in capital cases, it did not hold, as Appellant asserts, that it is error for the trial court to give the instruction during the penalty phase of a capital trial. *Foley* only held that the trial court did not err in failing to give the instruction. *Id.* at 886. Here, the capital penalty phase was combined with the so-called "truth-in-sentencing" phase of the trial because Appellant was convicted not only of two capital offenses but also of two Class B felonies and two Class D felonies. In view of the sentences of death for the capital offenses, the trial court properly treated the consecutive sentence recommendation as applicable only to the sentences for the lesser offenses.

### 6. *Capital punishment verdict forms.*

Appellant argues that the trial court's capital verdict forms improperly directed the jury to automatically impose an aggravated penalty upon the finding of an aggravating circumstance. We have considered and rejected this argument on numerous occasions and continue to adhere to our prior holdings. *E.g., Caudill, supra,* at 674–75; *Hodge, supra,* at 854; *Foley,* 942 S.W.2d at 888–89.

### C. *Cross-examination of Angel Soto.*

Angel Soto, Appellant's older brother, testified during the penalty phase that he and Appellant were both physically and psychologically abused by their foster parents and that, as a result, he (Angel) had difficulty controlling his own anger. The following colloquy occurred during cross-examination by the prosecutor:

Q. And despite the treatment and abuses that you have described earlier, I assume that you do not beat your wife, do you?

A. No sir.

Q. You do not beat your nine-year-old daughter?

A. No sir.

Q. And you have never murdered two people?

A. No sir.

■ Contrary to Appellant's assertion, this line of questioning did not exceed the wide latitude afforded to parties on cross-examination. KRE 611(b); *Bray v. Commonwealth,* Ky., 68 S.W.3d 375, 384–85 (2002); *Commonwealth v. Maddox,* Ky., 955 S.W.2d 718, 721 (1997). The purpose of Angel's testimony on direct examination was to imply that Appellant's abusive family background caused him to shoot his ex-wife and murder his former in-laws. The Commonwealth was entitled to rebut this premise by showing that, despite sharing the same background, Angel had not been moved to commit similar crimes of vio-

lence. The trial court did not abuse its discretion in permitting this line of questioning. *Bray, supra,* at 384–85; *Maddox, supra,* at 721.

## X. ALLEGED PROSECUTORIAL MISCONDUCT.

 Appellant alleges several instances of "prosecutorial misconduct" during the Commonwealth's guilt and penalty phase closing arguments. All of these allegations are meritless.

> Any consideration on appeal of alleged prosecutorial misconduct must center on the overall fairness of the trial. In order to justify reversal, the misconduct of the prosecutor must be so serious as to render the entire trial fundamentally unfair.

*Stopher, supra,* at 805 (citations omitted).

 During his guilt phase argument, the prosecutor characterized Appellant's claim of voluntary intoxication due to the consumption of antihistamines as the "drowsy defense." "A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth,* Ky., 744 S.W.2d 407, 412 (1987). The prosecutor's comment was mild compared to other comments that we have declined to characterized as misconduct. *E.g., Stopher, supra,* at 806 (classification of defense theory as "stupid"); *Luttrell v. Commonwealth,* Ky., 952 S.W.2d 216, 218 (1997) (characterization of defense witnesses' testimony as a "story"); *Slaughter, supra,* at 412 (criticism of defense counsel for presenting a "great octopus defense" and "pulling a scam").

 It was not improper for a prosecutor to comment on the thoroughness of the police investigation—especially where, as here, defense counsel accused the police of misconduct and characterized their investigation as "shoddy." The prosecutor did not comment about evidence outside of the record when he stated that Appellant was "lucky" he was not charged with attempted murder of Brianna. The remark was made while discussing the strength of the evidence supporting the charge of wanton endangerment in the first degree, *i.e.,* the firing of shots through the garage door knowing that Brianna was somewhere on the other side of the door:

> In the certain knowledge that his little daughter, who he professed to love so much and wanted to see so badly, was right in the pathway, right in the line of fire. And when he fired through that door, for all he knew, she could have been laying on the floor, right behind the door in the path of that bullet— thank God she wasn't. Wanton endangerment? He's lucky it's not attempted murder of his child.

The statement was not a comment on evidence outside the record but a comment on the weight of the evidence indicating Appellant's guilt. *Woodall v. Commonwealth,* Ky., 63 S.W.3d 104, 125 (2001); *Slaughter, supra,* at 412.

 The prosecutor's comment during his penalty phase closing argument thanking the jury on behalf of the Commonwealth, the victims' family, the police, and the community, for the time and effort spent in the performance of their duties as jurors was not misconduct. This type of comment, though gratuitous, hardly rises to the level of argument that "tends to cajole or to coerce a jury to reach a verdict which would meet with the public favor." *Jackson v. Commonwealth,* 301 Ky. 562, 192 S.W.2d 480, 482 (1946) (citations omit-

ted). "A prosecutor may call on the jury to do its duty." *Slaughter, supra,* at 412 (citations omitted). Nor did the prosecutor's reference to the jury's "prayerful deliberations" improperly inject religion into the court proceedings. *See Eldred v. Commonwealth,* Ky., 906 S.W.2d 694, 707 (1994) (no reversible error in Commonwealth's frequent biblical references during closing argument), *overruled on other grounds by Commonwealth v. Barroso,* Ky., 122 S.W.3d 554, 563–64 (2003).

▌ Nor did the following statement during the prosecutor's penalty phase argument constitute misconduct:

> It goes without further saying or imploring that the representatives of the Commonwealth believe that the law justifies, permits, and the evidence warrants imposition of the death penalty in this case and the imposition of maximum penalties on the remaining charges. It is a serious decision. It is one that you must take seriously.

Obviously, a prosecutor is permitted to argue during the penalty phase of a capital murder trial that the evidence warrants the imposition of the death penalty.

▌ No prejudice resulted from the prosecutor's statement that the 1996 "no contact" order resulted from a "confrontation" between Appellant and Mr. Porter. The trial judge had forbidden any mention of the truth, *i.e.,* the burglary charge. The jury had heard evidence that Appellant had "stalked" Armotta after she left him and that he was confronted by Mr. Porter when he came to the Porter residence wanting to see Armotta. Certainly, relating the "no contact" order to this confrontation was less prejudicial than leaving it to the jurors' cumulative speculation as to why the order had been entered.

▌ The prosecutor's penalty phase argument that the jury had already found the aggravating circumstances of first-degree burglary and multiple intentional murders was a "fair comment on the jury's guilt phase verdicts." *Caudill, supra,* at 676. Indeed, the only undecided issue at that point was whether Appellant committed the murders while engaged in the commission of first-degree burglary. KRS 532.025(2)(a)(2). The Commonwealth and the defense, logically, had different views on that issue.

▌ In his penalty phase argument, the prosecutor made the following statement with respect to the mitigating circumstance of EED:

> That the offense was committed under extreme emotional disturbance. That's a word we use that's sometimes called "sudden impulse" or "heat of passion." The crime was intentional, but there was some aggravating factor in the defendant's mind.

Although "heat of passion" and "sudden impulse" are not found in the definition of EED as a defense, *McClellan,* 715 S.W.2d at 468–69, that definition does not apply when EED is used as a mitigating circumstance. *Caudill, supra,* at 673. There is no statutory definition of EED as a mitigating circumstance and we are unable to conclude that the prosecutor's characterization of it as "heat of passion" or "sudden impulse" is so plainly erroneous as to constitute misconduct.

▌ With respect to Appellant's "youth" as a mitigating factor, the prosecutor commented as follows during his penalty phase argument:

> The youth of the defendant at the time of the crime. That has to be a relative, subjective, decision. I submit to you

that a man who has graduated from high school, gone to college, served in the military and attained the age of twenty-seven or twenty-eight years old, fathered three children, gone through two marriages, held a variety of jobs, should not be considered a child or treated as a child.

This statement was fair comment on Appellant's claim that his "youth" was a mitigating circumstance. *Tamme,* 973 S.W.2d at 38; *Bowling,* 873 S.W.2d at 178–79.

■ Finally, we do not regard as misconduct the prosecutor's characterization of the testimony of Appellant's retained psychologist as "malarkey." *Stopher, supra,* at 806; *Slaughter, supra,* at 412.

## XI. MISCELLANEOUS ISSUES.

### A. Courtroom security.

■ Appellant claims that the security used at his trial was so excessive as to deprive him of the presumption of innocence. The security detail for Appellant's trial consisted of three uniformed police officers and one plain-clothed officer. The uniformed officers were stationed at various areas inside the courtroom, including the exits, while the plain-clothed officer sat approximately five feet behind Appellant during the course of the trial. In *Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the United States Supreme Court held that "reason, principle, and common human experience counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial." *Id.* at 569, 106 S.Ct. at 1346 (quotation and citation omitted). Instead, the Court endorsed a case-by-case examination of such issues. *Id. See also Hodge, supra,* at 839 ("[W]e [do not] believe that the presence of armed policemen in the courtroom constitutes prejudice *per se.*"). The security measures implemented in the present case were far less pervasive than the measures upheld in *Holbrook* (twelve uniformed officers) and *Hodge* (two uniformed bailiffs, two uniformed state police officers stationed ten feet from the defendant, and several additional officers who were not in uniform). Appellant was not shackled or dressed in prison clothing during his trial. Considering the nature of the crimes with which Appellant was charged, we do not view the security provisions as excessive or as depriving Appellant of the presumption of innocence.

### B. Constitutionality of death penalty.

■ "[A]rguments that the death penalty is discriminatory and arbitrary, and that our statutory scheme does not provide constitutionally adequate guidance to capital sentencing juries, have been raised, considered and rejected by this Court on numerous occasions." *Id.* at 854 (citations omitted). "Our views with respect to those arguments remain unchanged." *Id.*

### C. Trial judge's role in sentencing.

Appellant cites a statement in *Matthews v. Commonwealth,* 709 S.W.2d 414, that "the statutory scheme not only permits, but anticipates, that the trial court will play a separate and different role in sentencing in capital cases after the jury's verdict has been received," *id.* at 423, and claims that the sentencing scheme is flawed because it does not articulate what that "separate and different" role might be. We addressed and rejected this same argument in *Caudill, supra,* noting that the quote from *Matthews* was out of context. *Id.* at 678–79.

### D. Constitutionality of proportionality review.

As noted in *Caudill, supra,* at 678, there is no constitutional right to a proportionality review. *Pulley v. Harris,* 465 U.S. 37, 44, 104 S.Ct. 871, 876, 79 L.Ed.2d 29 (1984).

*E. Cumulative error.*

No cumulative error occurred that requires reversal in this case. *Compare Funk,* 842 S.W.2d at 483.

## XII. PROPORTIONALITY REVIEW.

Pursuant to KRS 532.075(3) we have reviewed the record and determined that the sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary factor. There was ample evidence to support the jury's findings regarding all three aggravating circumstances. We have also examined all death penalty cases since 1970, particularly those cases in which a defendant was convicted of multiple intentional murders committed during the course of a burglary and sentenced to death, *viz: Hodge v. Commonwealth,* Ky., 17 S.W.3d 824 (2000) (two murders, robbery, and burglary); *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293 (1997) (two murders, robberies, and burglaries); *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414 (1985) (two murders and burglary); *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985) (two murders, robbery, and burglary); *White v. Commonwealth,* Ky., 671 S.W.2d 241 (1983) (three murders, robbery, and burglary). Comparing the facts of the present case with those of similar cases in which the death penalty was imposed, we conclude that the death sentence imposed in this case was neither excessive nor disproportionate.

Accordingly, the judgments of conviction and the sentences imposed by the Oldham Circuit Court are affirmed.

LAMBERT, C.J.; GRAVES, and JOHNSTONE, JJ., concur.

WINTERSHEIMER, J., concurs in result only.

STUMBO, J., concurs except as to Part VI.

KELLER, J., dissents by separate opinion, with STUMBO, J., joining that dissenting opinion as to Part I only.

KELLER, Justice, dissenting.

I respectfully dissent from the majority opinion and vote to reverse the Oldham Circuit Court's judgment of conviction and to remand the case for a new trial. My most significant disagreement with the majority opinion concerns Part VI(C) (Right to Control Defense—Closing argument). While a majority of this Court rejects this allegation of error in a single paragraph, I do not believe that Appellant's claim can be so easily dismissed. In fact, my review of the record leads me to the conclusion that the trial court committed structural error by denying Appellant his constitutional right to self-representation, and this error mandates a new trial notwithstanding the strength of the Commonwealth's case against Appellant. Because I disagree with several other aspects of the majority's analysis—specifically, Parts IV(A) (Jury Selection—Failure to excuse jurors for cause), VI(B) (Right to Control Defense—EED as a mitigating circumstance), VII(C)(2) (Evidence Issues—Authentication—DD Form 214), VII(B) (Guilt Phase Instructions—Manslaughter in the second degree and assault in the second degree), IX(B)(5) (Penalty Phase Issues—Other penalty phase instructions—Concurrent/consecutive sentence recommendation), and X (Alleged Prosecutorial Misconduct)—I also write

separately to describe my views on those allegations of error.

## I. DENIAL OF CONSTITUTIONAL RIGHT OF SELF–REPRESENTATION

In *Faretta v. California,*[1] the United States Supreme Court held that the Sixth Amendment to the United States Constitution[2] "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense."[3] The Court thus explained that a state could not force a criminal defendant to proceed to trial with counsel because "the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment."[4] A year earlier, in *Wake v. Barker,*[5] our predecessor Court had addressed the same issue and, after analyzing the rights to counsel guaranteed by both the United States and Kentucky Constitutions,[6] reached the same conclusion, *i.e.,* "an accused who has made a valid waiver of counsel has a right, if his waiver so indicates, to proceed to trial without counsel being in any way associated with him."[7] The *Wake* Court, however, further held that the rights of self-representation guaranteed by the federal and state constitutions permitted a criminal defendant to make a limited waiver of his or her right to counsel and proceed to trial under a "hybrid" of appointed legal counsel and self-representation:

> [A]n accused may make a limited waiver of counsel, specifying the extent of services he desires, and he then is entitled to counsel whose duty will be confined to rendering the specified kind of services (within, of course, the normal scope of counsel services). We think that this is embraced within the right-to-counsel and equal-protection provisions of the federal and state constitutions. *If the accused desires to have counsel available only for the purpose of consultation during the trial, why should he not be entitled to that?*[8]

Recently, in *Hill v. Commonwealth,*[9] we observed that "a prototypical example of a 'structural error' [for which harmless error review is inappropriate] is the denial of the

1. 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

2. "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI.

3. *Faretta,* 422 U.S. at 819, 95 S.Ct. at 2533, 45 L.Ed.2d at 572.

4. *Id. See also id,* 422 U.S. at 820, 95 S.Ct. at 2533, 45 L.Ed.2d at 573 ("To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists.").

5. Ky., 514 S.W.2d 692 (1974).

6. "In all criminal prosecutions the accused has the right to be heard by himself and counsel ...." KY. CONST. § 11.

7. *Wake,* 514 S.W.2d at 695. *See also Hill v. Commonwealth,* Ky., 125 S.W.3d 221, 225 (2004) ("[A] defendant also has a state and federal constitutional right to proceed *without* a lawyer." (emphasis in original)).

8. *Id.* at 696 (emphasis added). *But see McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (stating that *Faretta* "does not require a trial judge to permit 'hybrid' representation").

9. Ky., 276 Ky. 754, 125 S.W.2d 221 (2004).

right to proceed *pro se* [.]" [10] In this case, Appellant unquestionably sought to make a limited waiver of his right to counsel so that he could personally participate in trial proceedings, and the trial court erroneously denied Appellant that right.

A review of the record in this case plainly reveals that—beginning at least with Appellant's decision to reject the Commonwealth's plea offer of a sentence of life imprisonment without possibility of probation or parole and continuing through strategy decisions regarding the capital sentencing phase—Appellant and his appointed trial counsel did not see eye-to-eye on many issues relating to the defense. In fact, on multiple occasions, Appellant voiced to the trial court his desire to represent himself by becoming "lead counsel" while his appointed attorneys would continue to represent him both by being available for consultation as well as by performing portions of the trial proceedings at his direction. Each time that Appellant articulated this request, the trial court brushed it aside. The record as to each request illustrates that either the trial court or Appellant's appointed counsel, or both, failed to comprehend the nature of Appellant's current or past requests or the scope of Appellant's right to self-representation, especially hybrid representation permitted under *Wake,* which was never mentioned or addressed by either Appellant's trial counsel or by the trial court.

A few months before the trial, Appellant wrote a letter to the trial judge in which he outlined his concern about his attorneys' agreement to a trial date that, in Appellant's view, denied him his constitutional right to a speedy trial. At a hearing scheduled by the trial court in response to Appellant's letter, the *trial court* felt it

necessary to broach the topic of whether Appellant wished to represent himself, and Appellant responded that he wished to be named lead counsel. The trial court clearly did not contemplate the possibility of a hybrid representation whereby Appellant would represent himself alongside appointed counsel and thus never specifically addressed Appellant's request. Instead, the trial court merely verified that Appellant wanted his appointed counsel to continue to represent him and considered the issue closed:

Court: Let me step to representation. Do you want to represent yourself?

Soto: At this time your honor?

Court: At any time.

Soto: I can't say that for any time. I can't look in the future and see what happens.

Court: Do you have problem with current representation by the public defender?

Soto: At this time, I believe me as lead counsel would rectify any problems I might have in the future.

Court: I have no idea what you're saying.

Soto: I'm trying to get my discovery, your honor. I'm trying to get my discovery less than two times a month, and with John's caseload and Elizabeth's caseload I can't do that. The only way to get my discovery, they won't allow me to have it upstairs in my cell because they're afraid of people possibly looking into it

Court: You're going way beyond, I have no idea what you're talking about. *My question to you is this.*

10. *Id.* at 229.

*Do you want John West and Liz Curtain to represent you or not?*

Soto: At this time, yes.

. . . .

Court: That's the second part of it. There are two attorneys on this case. Mr. Soto here on the record today with those comments you made, I specifically asked you do you want John West to continue representing you and Liz Curtain and you have told me, yes, that's okay?

Soto: Yes.

Later, at trial, immediately after the Commonwealth's opening statement, the parties met in chambers with the trial court and Appellant advised the court that he was dissatisfied with the opening statement that his attorney intended to make and asked the trial court to permit him to deliver his own opening statement. Again, Appellant's trial counsel objected. The trial court concluded that Appellant had a right to deliver an opening statement, but apparently did not equate permitting Appellant to deliver the defense's opening statement with permitting him to act as co-counsel:

Court: What's your request Mr. Soto?

Soto: Your honor, simply what you just said, to opening my own statement. I've listened to John's statement, I don't agree with it as what he has in there. I worked on my own statement, John refused to look at it, I think it will benefit my case and my trial. My own statement.

. . . .

Court: Let me make a couple of rulings. First of all, in regard to matters that are not in front of me. Case law indicates that certain things are exclusively within control of trial counsel. The public defender is lead counsel in this case. They are not co-counsel. So as far as the how to conduct cross-examination, what jurors to accept as tried, what trial motions should be made and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client. So he has made the request and at this point what response by defense counsel is to whether or not he should be allowed to participate to that extent. I have excluded some things that I'm not going to get into later on concerning cross-examination. So I need to know as far as defense counsel's statement progressing through this trial, can you advise the Court as to your position as to the defendant's desire to make an opening statement on his own behalf?

Curtain: Judge, I'll handle that one. I believe that under the law and under the rules that unless he has been declared co-counsel, he does not have a right to make an opening statement. Like directing cross-examination, all the other strategic decisions that we make during the course of the trial, what we present in opening is also can lead us to what we do during cross-examination and everything else. And in *Faretta* it's clear. If he wants to be declared co-counsel, which he has declined to do so, then as such he has participated up to this point and time, presenting his case as he sees it, but I don't believe that he has the right to participate in doing the opening.

West: Judge, just to clarify, I think there is a minor distinction between co-counsel and *Faretta* counsel. My understanding is if he is, if we are to

be *Faretta* counsel, then we are whisper or standby as opposed to actually being co-counsel. Being co-counsel we would be somewhat concerned about our liability in this action since he is not trained. I don't know that we have an objection to being *Faretta* counsel. We would object in a sense that I don't think—if he's insistent on participating.

. . . .

Comm: Judge, I think we feel that there may be a distinction to be made between opening statement and what Elizabeth correctly described as intra-trial, not my word but hers, but witness-to-witness, question-to-question, trial strategies. Without waiving any future objection to this getting out of hand in a sense where we have counsel examining a witness and then the defendant examining a witness and just glancing at the cases, it may be that offering his own opening statement is a different animal than making objections at trial and making tactical decisions as to what questions are asked. But I think the long and the short of it is without waiver of future objection the Commonwealth does not take position either in support or in objection to that request.

. . . .

Court: [D]ealing with the *Faretta* case, you cannot force a lawyer upon an unwilling defendant because that's contrary to his basic right to defend himself if he truly wants to. So the Court recognized the importance of counsel at a fair trial the defendant's right, to have counsel present is a constitutional entitlement but the right to defend is personal. The defendant and not his lawyer or the state will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case, counsel is to his advantage. So, what I'm thinking at this particular point is that a defendant can maintain his right to remain silent, stand upon reasonable doubt, and say to the Commonwealth "you're going to have to prove that I did this beyond a reasonable doubt." That does not remove his opportunity to make statements in opening to a jury. Now, I need to ask just a couple of questions. Mr. Soto, as far as the range of penalties, we have covered that. All I want to know is you have heard the Commonwealth cover the indictment and you understand the charges that were brought? Can you kind of summarize them? How many separate indictments are there?

Soto: There are six.

Court: There's six? And what are those?

Soto: Two counts of murder. One count of attempted murder. Burglary in the first degree. Wanton endangerment and tampering with physical evidence. I'm not sure those two are in order. I think they are same Class D Felonies.

Court: And why has this jury been convened?

Soto: Because I have been indicted by a grand jury.

Court: And beyond that, you have entered a plea of what?

Soto: Not guilty.

Court: So this jury has to decide guilt or innocence in the case?

Soto: Correct, your honor.

Court: And what do you see as far as the role of John [West] and Liz Curtain in this case?

Soto: The role, I mean the conversations that we've had, the lawyer/client privilege, I don't feel they're competent in supporting my plans to go through this trial. They've told me, I don't feel comfortable, I've listened to John's opening statement, it's a good twenty seconds, it doesn't cover what needs to be covered. I believe that needs to be covered in opening statement.

Court: When you say competent, you mean they're not in agreement with your evaluation as to what needs to be given to the jury. Not that they're competent as attorneys.

Soto: When you say competent, qualified. I think John and Liz are qualified as lawyers. At this point, I don't believe they're qualified to defend me in this trial. *At one point, as you recall, I tried to go pro se, not pro se, but appoint myself lead counsel which you denied. And that way I will have John and Liz as stand by counsel.* That was back in, I believe November of 99. I mean this is just an opening statement. I would like to run it by John but he refuses. And right there shows me that I get no support from him at all in this trial.

Court: He has prepared an opening statement?

Soto: He has.

Court: And he's covered that opening statement with you?

Soto: Yes, your honor.

Court: And he's asked for your comments and you have given them to him?

Soto: He has not asked me for any comments on his opening statement. He said just point blank, that's it, that's all he could do.

. . . .

Curtain: Judge, I would just ask for a clarification. Does he or does he not want to proceed as counsel in this case? I mean, we can't keep running back here every five minutes

Court: *I don't think the Court will alter its previous rulings. He will not be lead counsel. You all are lead counsel and you make all decisions relating to decisions as to what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client.* Now, the only thing I'm into is on an opening statement, the right to defend. Let me go just a little bit further, have you ever gone through opening statements to a jury before?

Soto: Not. . .

Curtain: Judge, just a quick clarification, he was never overruled as being his own counsel in this case. He did withdraw it at that time.

Court: I understand.

West: Our position is, Judge, we do not want him to be co-counsel in this case. We would, if he is insistent, we would be *Faretta* counsel. We don't think it's in his best interest.

Court: You're lead counsel. He has not requested to be co-counsel at this point. He's just saying, I want to make my opening statement. That's all I have in front of me.

West: Our position, Judge, is he would have to be co-counsel to make the opening statement.

Court: And this is where this *Faretta* and *Treece* [*v. State*, 313 Md. 665, 547 A.2d 1054 (1987) ] case[s] carve out an exception in regard to opening statements. As I understand it. Am I, I guess I better read the case here.

Soto: If I was to assert my constitutional right to go pro se and keep my lawyers as stand by counsel, will that still work?

Court: I don't have that motion in front of me and I'm not going to participate in what ifs. All I'm trying to do is make a determination as to whether or not you have a right over objection of lead counsel to make an opening statement. And there is case law that indicates that I'm obliged to conduct an inquiry to make sure that you're aware and have been fully informed of the alternatives available and that you comprehend the consequences of any acts taken by yourself in asserting this right to make the opening statement. If you choose to waive those, then you are entitled to do it. You have been previously found competent by findings, I'm referring to information that has been given to the Court on prior occasion and I think it's important for me to refer to that. I'm also of the opinion that he has a, I'm satisfied at this point that, let me back up just a minute. John, I'm not going to make an inquiry concerning discussion in regard to what discussions took place, but I think I do have a right to make an inquiry that these matters were covered. What was said doesn't make any difference to me. But these mat-

ters concerning the opening statement were covered with you or covered with the defendant.

West: He covered with me what his side was, I've got in my possession documents indicating what his position is, he had written those out for me. With the specific regards of what is coming in an opening statement, I told him what I did not want to bring in, I don't know and I haven't seen his latest version but he probably worked on it over the weekend, what he does want to bring in. I saw him Saturday?, Sunday I saw him and today he's got this opening statement. I have not seen the opening statement as of today. He wanted to share it with me this morning, I told him that at this point and time we are going to move forward.

. . . .

Court: Now this *Treece* case, was a decision by counsel overriding the statements of the defendant to exert or not exert a defense. The State of Maryland was through their Court of Appeals, reversed it and sent it back. They indicated that the Court was obliged under those circumstances because a plea of guilty did not deal with trial strategy. That dealt with the defendant's right to enter a plea. So any exertion in the defense. So they sent it back and said no, you have to have this hearing, have the hearing, and at that point if you find out that he's competent and that he has the necessary threshold requirements to tell his counsel what he wants in regard to that plea, then he goes ahead and does it. So they reversed the Court because they didn't allow it. The trial court. So now I'm dealing

with not an exertion of the defense, but an opportunity to frame the defenses that are available. *Treece* also says the defendant ordinarily has the ultimate decision when the issue end involves a choice that will inevitably have important personal consequences for him or her and when the choice is one a competent defendant is capable of making. With these things being placed of record, I am going to sustain the defendant's right to make an opening statements under these circumstances. Number 1 is before we make the opening statement, he must be given the opportunity to explain this to counsel so that they're not surprised by developments in the courtroom. The second thing is that if the defendant does not cover items after his opening statement defense counsel has the right to make an additional summary. The third thing is that in regard to security in the courtroom, the Court will adopt the recommendations that the restriction of movements will be at the podium or to the bench and that anything outside of that would result in the Court adjourning briefly and placing the defendant in a stationary position.

. . . .

Court: I think at this point, he has counsel present, he has received advice from counsel, he can otherwise capably go forward and if he chooses to reject that, then I think any statements made by him can be used for impeachment purposes or for any other reason appropriate under the circumstances of the case at a later stage in the proceeding. Now let me get down to this closing argument, even before we get to it. Closing argument is a little bit different than opening statement. I am of the opinion that the calling of witnesses as I have indicated, cross-examination of witnesses, trial motions are the exclusive providence [sic] of counsel. Defense counsel continue to be lead counsel but the Court's going to sustain his right to make an opening statement. This does not mean that he has the latitude to make closing arguments because there we are dealing exclusively with evidence and we're dealing more with trial strategy based upon the presentation of proof. So I think, the other thing is in an opening statement, no personal opinions and objections will be taken up at the bench with appropriate sheriff present.

. . . .

West: Our other position is we would object and we want to make sure that it's on the record, with regard to the previously stated objections, that we would object to allowing him to make the opening statement and that if the Court is going to allow him to make an opening statement, we would ask to be counsel, not co-counsel, but counsel under *Faretta*. We would object to being co-counsel in this case or allowing him to make the opening statement as co-counsel. I don't -

Court: *I would agree that he is not making the statement as co-counsel. He's making the statement as the defendant, in the defendant's entitlement to make the statement,* the only thing the Court can place of record at this point is that it is the defendant's right to present defenses and participate with counsel in the presentation of those defenses and *that's the only reason that I'm saying that the defendant has the right to do it.*

Curtain: Judge, I think at this point and time you are absolutely correct. There is no motion made by the defendant before this Court to make him counsel of record and we'll just leave it at that. We'll just note our objection for the record.

Appellant later withdrew his request to deliver the opening statement after his trial attorney allowed him to review the opening statement that the attorney had prepared and Appellant verified that "it covers everything that I had written about."

Subsequently, during the Commonwealth's case-in-chief, Appellant became concerned that his attorneys were not asking cross-examination questions that he considered important. Accordingly, in a hearing held in chambers, Appellant explicitly asked to be made lead counsel for purposes of the remainder of the introduction of evidence and closing argument. The trial court denied Appellant's request to question witnesses personally, but implied, as it had during the prior discussion of Appellant's right to give his own opening statement, that Appellant may be entitled to deliver the closing argument for the defense:

Soto: Your honor, there are some questions that need to be asked to Ms. Porter and my attorney doesn't want to ask those questions. *The only thing I could do is assert myself as counsel and my constitutional right to go pro se.* That way these questions are asked because I know, I think we discussed it before, *the only way this is going to happen for me to ask questions is if I put in a motion for pro se.*

Court: There is no question you have the right to pose questions. Questions would be posed for counsel. Participation by the defendant is not unlimited. *So you are saying you want to represent yourself at this stage and ask questions of this witness. That's what you're asking?*

Soto: Yes, your honor. To have John West as stand-by counsel.

Court: And Mr. West?

West: Judge, I'm not sure of the questions he is talking about. He asked the questions that I was going to ask. I showed him the questions that I was going to ask. Bill asked some of the same questions already. Rather than being repetitive, I took some of those questions out. I'm not sure what additional questions there are that Mr. Soto would care to ask.

Curtain: You know Judge, in addition, this is a death penalty case. I mean, we are three quarters of the way through the trial. He doesn't have any expertise, nor does he have the experience to become legal counsel in this case.

Court: I think that I kind of previously approached this. I think the defendant can control those things for which touch upon his constitutional entitlements, and in particular anything that reflects upon a plea of guilty or the exertion of a defense which means I may be guilty but under these circumstances, he can control those things. In addition to that, he has the constitutional entitlement always to be present and in each and every critical stage of the proceeding we've made sure that we've done that. So now we've reached the stage where in previous pre-trials the Court has ruled that the defendant is capable of

knowingly and voluntarily waiving the right to exert certain defenses. I also indicated that in conformity with law as I understood it, all other tactical and strategic decisions rest with counsel of record. So I have two motions in front of me arising out of that. Tactical and strategic has to do with the calling of witnesses, questioning and cross-examination. *So we are down to the stage at this point where the defendant wants to fire his counsel, you don't want to fire him, you just want to say you want to become counsel from this point forward. Is that correct?*

Soto: Yes sir.

Court: So you want to be counsel of record also for closing statements?

Soto: Yes, your honor.

Court: Hmmm. And I think there is sufficient evidence in the record that I had previously indicated that defense counsel continues as lead counsel.... You are going to have to explain to me a little bit more Mr. Soto why half way through a trial there is some compelling reason you want to replace counsel of record.

Soto: Your honor, this has been throughout the whole trial with me and my counsel. About questions that were going to be asked. And I told counsel, last time I told him was this morning, that if he didn't ask the questions then I would represent myself and he understood that, he said "go ahead, do what you gotta do," and that's what I took from there. I think these questions are vital to my defense to witnesses that are hopefully are going to be subpoenaed to testify tomorrow.

. . . .

Curtain: Judge, quite honestly [inaudible] gives him the absolute right to represent himself in a case and the Court has already had hearings as to whether or not he's capable of intelligently and voluntarily making decisions in regards to his defense and I'm not real sure that he understands what he's getting into. But that's a decision for the Court to make.

Court: I think just the exertion "they didn't ask the questions that I want to ask" probably is not sufficient. A couple of reasons for that. Not every question can be asked of every witness. Questioning has to be under the rules of evidence, both as to admissibility, competency and relevancy. First of all, it requires some training and background and working knowledge in regard to the rules. On restricted right to ask questions based upon other than those procedures is improper. So I think that just the exertion of saying "they didn't ask the questions I liked," is not sufficient for me to have him step aside as counsel. It's just insufficient. You do have the right to exert yourself at certain stage of the proceedings and although we are not at closing arguments I am probably preliminarily of the opinion that your right of making the closing statement is unique to give. Same as right to make an opening statement. That's your constitutional entitlement. You make the closing statement, I realize I am kind of going in reverse order here, if you make the closing statement, then the closing statement has to bear upon the evidence and reasonable inferences arising from the evidence, it's not a personal opportunity to express opinions though. I

think based upon the status of the case probably the Court would say if you want to, if you make the request to make the closing statement, you're probably entitled to it. And after you make your closing statements, John will have the opportunity to make any additional closing statements to make sure that the case is fully represented in front of the jury.

. . . .

Court: But at this point the Court is not inclined to believe that just simply because you have a question you want to ask of this witness that I am going to fire counsel and the Court, I don't think it arises to the occasion. And quite candidly I'm not sure that I have sufficient information in front of me that you would conform your actions to the requirements of the rules of practicing law. Even if you are pro se you are still bound by the rules. Can the Commonwealth advise me just the criteria, what does the Court look like when I allow a defendant to start practicing his case by himself?

Comm.: Judge, I think two things. First, you run some risks that he will as Elizabeth has alluded to very vividly and discreetly make errors that will be dangerous for him. I think there is a high likelihood in that situation that there will be violations of the rules of evidence and the rules of procedure and from my reading of cases which the Court has [inaudible], there is no question in mind that not only asking questions but the line of questioning and declining to ask a question is a tactical decision that is absolutely best left to experienced trial counsel.

Court: I think what I will probably do at this point is I'll deny your request to be counsel of record. However, I will allow you the opportunity to ask additional questions through counsel and those questions if they are not asked by counsel can be sealed and made a part of the record for further review. If counsel chooses not to ask the question, there probably should be some brief statement placed in the record that this is either cumulative or whatever it is. But I think he is entitled to say I want this question asked and I think it's going to have to be in some type of forum that it can be preserved. How that would be, written questions or part of the record, I don't know.

. . . .

Court: I think trial tactics including which witnesses to cross-examine and the cross-examining question is a strategy to be exercised by counsel of record. It is not an unrestricted constitutional right. The right to enter a plea or not to enter a plea or exert a defense is exclusive to the defendant. And I think probably his closing argument probably comes ·close to that. At this point, what I'm going to do is recess. I will allow you to talk with him.

Curtain: I was talking about his right to be his own counsel. That concerns me a little bit because there is the *Wilson* case that appeared before the Kentucky Supreme Court and dealt with an issue like this. They never actually had to address that issue because he just only objected to who his counsel was. He never actually asked to proceed pro se. So I need to get a ruling from the Court. Does the Court consider he's overruling his motion to become his own counsel?

Court: I think that I stated as part of the video recorded proceeding that I would deny the request to become pro se counsel at this point and, not to fire counsel, but ask you to step aside.

Finally, during an instruction conference held after all of the evidence had been introduced, Appellant informed the trial court that he wanted to give the closing argument for the defense, and his attorneys again objected. The trial court initially ruled that it was inclined to permit Appellant to present the closing argument for the defense, but later revisited the issue and denied Appellant's request. At that time, the on-the-record discussion between defense counsel, Appellant, and the trial court once again reveals that, of the parties present, *Appellant* appeared to have the most accurate conception of the scope of his constitutional right to self-representation. In fact, both the trial court and Appellant's trial counsel erroneously informed Appellant that the hybrid representation arrangement he desired was impermissible:

Curtain: The first thing I would like to point out to the Court is I don't believe Mr. Soto is asking that we be relieved of counsel. I think what he is asking this Court is "I want to do the closing argument." And if that's the case, he is attempting to practice law without a license and he can't do that. So what he is attempting to do, and quite honestly I am starting to feel like a yo-yo, you know, we go up, we go down, we go up, we go down, on this issue. And he has yet to approach this Court to ask us to be relieved as his counsel. What he's asking this Court for is an opportunity to practice law without a license and he is not entitled to do that. You know, he doesn't get to have his cake and eat it too in this situation. We are either his attorneys and we represent him or we are not his attorneys. But, we have, this is the third time we have come before the Court on this issue and he has yet to make a clear statement to this Court that he wants to relieve us as counsel and he wants to proceed on his own. And quite honestly, at this point and time, Judge, we are at the end of the trial, we are getting ready to enter into, most likely, a very complicated area of mitigation where if he has no counsel, he is going to be in some serious trouble. But he doesn't get to pick and choose areas where he goes, okay, I want to represent myself in this area, but then, okay, when we are done with that, I want my counsel to come back on. That's not fair to us, and it's definitely not fair to him. These types of cases are too complicated and there has been no formal motion by this guy to ask us to be relieved as counsel. And I would ask the Court based upon that that he not be entitled to do a closing argument.

Court: Mr. Soto, I have heard comments here but I don't know what you want to do.

Soto: Your honor, it is my understanding that, and I am not sure if you told us or told me that before, but my understanding was if I went pro se that I could have the option of keeping counsel as standby. And that is what I am referring to. Now, in this case, if I have to get rid of my attorneys, my counsel, in order for me to do my closing statement, no, I don't want to do that. I am not an idiot to where I am going to do something like that. So, I want to know what the

ruling is going to be, what the law states. *Am I allowed to go pro se and allowed to keep my counsel as standby?*

Curtain: It's not standby, it's whisper counsel. We would sit behind you while you conduct the rest of this trial.

Soto: It's my understanding, what I have read was standby counsel was making me lead counsel and my attorneys continued their job.

Court: Well, what do you want to do?

Soto: *What I want to do was give my closing statement. And allow my attorneys to continue what they have been doing for mitigation purposes, for the sentencing purposes, if I'm convicted.* To my understanding, the last thing we have for the guilt and innocence is the closing statement. Is that correct?

. . . .

Court: The sequence of closing arguments is first those to defense and then to the Commonwealth at the guilt or innocence stage. If you choose to make your closing statement I think under this one case that I have referred to, the *Robards* [*v. Rees,* 789 F.2d 379 (6th Cir.1986) ] case from the Sixth Circuit and also another case in regard to self-representation, that there is no just allowing a defendant to handle parts while having counsel handle other parts. So I think *in answer to the second part of your question, can you proceed and yet still have counsel? I think you can proceed and still have counsel, but you are the only one at that point who handles the case.* Now, probably I didn't make that clear during earlier parts of the proceedings.

Soto: No, your honor, but I do understand it now though.

In my view, the majority's attempts to rationalize the trial court's denial of Appellant's right to self-representation simply do not hold water. First, the majority labels Appellant's request to act as his own counsel untimely and, in doing so, attempts to apply a convenient bright-line, procedural default rule gleaned from jurisdictions with substantially different conceptions of the constitutional right of self-representation, *i.e.,* jurisdictions that, unlike Kentucky, do not generally authorize a *partial* waiver of counsel. Of course, the majority's contention ignores Appellant's *repeated* requests to be named lead counsel/co-counsel for purposes of trial, and, as I have observed above, the first of Appellant's requests came *months* before the trial commenced. More significantly, however, I would observe that the federal cases relied upon in the majority opinion place emphasis upon the timing of a defendant's motion to proceed pro se because of the nearly inherent necessity for a continuance of the proceedings to allow for trial preparation when a criminal defendant wishes to discharge counsel completely and represent himself on the eve of or in the midst of trial,[11] which would, no doubt, "frustrate the orderly procedures of a

---

11. *See Robards v. Rees,* 789 F.2d 379, 384 (6th Cir.1986) ("This Court also concludes that Robards' request for self-representation, if honored, would have impermissibly delayed the commencement of the trial.... Had the request been granted, the trial judge would have been obliged to postpone the commencement of the trial for an extended period of time in order to allow Robards a sufficient amount of time to prepare his defense.").

court in the administration of justice." [12] It is difficult, however, to apply that rule to the case before us—in which there is no claim made, and certainly no evidence to suggest, that granting Appellant's request would have caused *any* delay in the proceedings. Appellant's request and the hearing upon it occurred during a conference regarding the jury instructions that was conducted after the close of evidence and after the jury had been sent home for the day. The closing arguments themselves were not scheduled until the next morning, and defense counsel advised the trial court that, "[i]f this Court is inclined to allow him to do the closing argument, I will work with him tonight" on it. I would further observe that the timing of Appellant's earlier request to participate personally in the trial proceedings by delivering the opening statement for the defense was apparently a non-factor to the trial court, which granted Appellant's request although it was not made until *after* the opening statement for the Commonwealth and the proceedings in connection with Appellant's request resulted in delaying the proceedings for more than an hour between statements.

The majority opinion's assertion that Appellant "never specifically asserted his right to self-representation or to proceed *pro se*" [13] is flatly contradicted by the record, which not only provides the context necessary to properly characterize Appellant's request, but also demonstrates that Appellant expressly advised the trial court

during the colloquy concerning his desire to cross-examine witnesses that he "want[ed] to be counsel of record also for closing statements." Moreover, I am baffled by the majority opinion's suggestion that Appellant's voicing of his desire to make his own closing argument constituted something other than a request to represent himself at this stage of the proceedings. At the very least, Appellant's statement was "an unequivocal request to limit the role of counsel," [14] which required the trial court to determine whether Appellant's waiver was voluntary and intelligent. Of course, if Appellant had asked the trial court for permission to unclog the drains in the Oldham Circuit Courthouse, no one could seriously dispute that Appellant was asking to act as a plumber. Given that "[t]here can be no doubt that closing argument for the defense is a basic element of the adversary fact-finding process in a criminal trial[,]" [15] Appellant's request to deliver the closing argument for the defense, *i.e.*, a request to perform a task traditionally performed by defense counsel, necessarily constituted a request to act as co-counsel. In fact, the United States Supreme Court has recognized that "[a] defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard ... [including the right] to address the court and the jury at appropriate points in the trial," [16] and has stated that "[t]he[se] specific rights to make his voice heard ... form the core of a defendant's right of self-representation." [17]

12. *Id.* at 383.

13. *Soto v. Commonwealth*, 139 S.W.3d 827, 857 (2004).

14. *Moore v. Commonwealth*, Ky., 634 S.W.2d 426, 430 (1982).

15. *Herring v. New York*, 422 U.S. 853, 858, 95 S.Ct. 2550, 2553, 45 L.Ed.2d 593, 598 (1975).

16. *McKaskle*, 465 U.S. at 174, 104 S.Ct. at 949, 79 L.Ed.2d at 131.

17. *Id.*, 465 U.S. at 177, 104 S.Ct. at 950, 79 L.Ed.2d at 132.

Nor does the trial judge's speculation that Appellant "might use his closing argument to present unsworn testimony," [18] create any justification for prior restraint that would deny Appellant his right to self-representation. First, although the majority opinion describes the trial court's speculation as a legitimate concern, I would observe that the record suggests otherwise. From all indications, Appellant committed these horrible crimes. During the court proceedings, however, Appellant consistently maintained proper decorum and, even when he vehemently disagreed with his appointed counsel, demonstrated that he was capable of calmly and rationally relating his concerns to the trial court. Further, Appellant himself informed the trial court "I know what I'm not supposed to talk about anything other than evidence that came up in this trial. So it's not like I'm trying to testify[.]" In addition, both of Appellant's appointed attorneys indicated that they would be willing to work with Appellant to "make sure no objectionable matter comes into the closing argument." In any event, however, I would observe that, if an assertion that "the defendant is going to do something wrong" were a basis for denying a defendant's right of self-representation, virtually no defendant would ever be permitted to participate personally in his or her defense. Accordingly, the law does not recognize the likelihood of a defendant's incompetent self-representation as a basis for denying the right.[19] When delivering the closing argument, however, Appellant would be held to the same standards as a licensed attorney, the Commonwealth would have an opportunity to object to any improper argument or deviations from proper procedure, and the trial court would have been able to rule upon any such objections and grant any relief that it deemed appropriate.[20]

In my view, the record in this case shows beyond any doubt that Appellant was denied his constitutional right of self-representation. While it is true that a trial court has no obligation to inform a criminal defendant of his right to self-representation sua sponte,[21] in the case at bar, the trial court, which was from all indications unaware of *Wake v. Barker* and the availability of hybrid representation, ignored some of Appellant's requests to act as co-counsel and denied others after it mischaracterized the scope of Appellant's right of self-representation on the record. In addition, although "the public defenders' obligations to defend the indigent may properly be considered to embrace the duty to

18. *Soto,* 139 S.W.3d at 857.

19. *See Faretta,* 422 U.S. at 834, 95 S.Ct. at 2540, 45 L.Ed.2d at 581 ("It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts.... And, although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'"); *Crawford v. Commonwealth,* Ky., 824 S.W.2d 847, 849 (1992) ("A defendant has an absolute right to waive counsel and to represent himself and no determination as to the effectiveness of such representation need be made."); *Wake,* 514 S.W.2d at 695 ("No one contends that an accused must be capable of adequately representing himself in order to make a valid waiver of counsel.").

20. *See Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46, 45 L.Ed.2d at 581 n. 46 ("[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.").

21. *Baker v. Commonwealth,* Ky.App., 574 S.W.2d 325 (1978).

furnish limited representation[,]"[22] Appellant's appointed counsel actively objected to any form of hybrid representation that would allow Appellant to act as co-counsel. Although I recognize that a criminal defendant's direct participation in court proceedings is a deviation from the norm that can be frustrating for appointed defense counsel and can try the patience of a trial court, criminal defendants have a constitutional right to such participation at their criminal trials. In this case, the end result of the confusion regarding the scope of Appellant's self-representation rights and the nature of his requests was that Appellant's request to act as co-counsel for purposes of delivering the closing argument was improperly denied. This structural error entitles Appellant to a new trial.

## II. OTHER ISSUES

I disagree with the majority's Part IV(A) analysis because, in my view, the trial court abused its discretion when it failed to excuse Juror 42 for cause. The United States Constitution guarantees a capital defendant fair and impartial jurors who can consider any relevant mitigation evidence,[23] and Juror 42 unequivocally stated that she could not consider all of the KRS 532.025 statutory mitigating circumstances that were identified for her. As such, the trial court erred when it denied Appellant's motion to strike Juror 42 for cause. For reasons that I have explained in depth on prior occasions, however, I would not reverse Appellant's convictions on the basis of this error alone because I believe that Appellant's removal of Juror 42 with a peremptory challenge rendered the trial court's error harmless.[24]

As to Part VI(B), I disagree with the majority's apparent holding that defense counsel may "veto" a defendant's decision not to introduce mitigating evidence during the capital sentencing phase of a trial. Although the majority is correct in its observation that *Jacobs v. Commonwealth*[25] "did not address whether [its] holding extended to a waiver of mitigating evidence during the penalty phase of the trial,"[26] this Court very recently cited *Jacobs* for exactly that conclusion when we held that "the defendant is 'master of his own defense and pilot of the ship[,]' and thus may elect to ignore the advice of his counsel and to *waive the presentation of mitigating evidence*."[27] Accordingly, I agree with Appellant's claim that he was entitled to "call the shots" during the capi-

---

22. *Wake*, 514 S.W.2d at 696.

23. *Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S.Ct. 2934, 2951–52, 106 L.Ed.2d 256, 284 (1989) ("In order to ensure 'reliability in the determination that death is the appropriate punishment in a particular case,' the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." (citations omitted)); *Morgan v. Illinois*, 504 U.S. 719, 739, 112 S.Ct. 2222, 2235, 119 L.Ed.2d 492, 509 (1992) ("Any juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that jury has formed an opinion concerning the merits of the case without basis in the evidence developed at trial.").

24. *See Gamble v. Commonwealth*, Ky., 68 S.W.3d 367, 374–75 (2002) (Keller, J., dissenting); *Stopher v. Commonwealth*, Ky., 57 S.W.3d 787, 813–18 (2001) (Keller, J., dissenting).

25. Ky., 870 S.W.2d 412 (1994).

26. *Soto*, 139 S.W.3d at 855.

27. *St. Clair v. Commonwealth*, 140 S.W.3d 510, 560 (2004) (citation omitted).

tal sentencing phase of his trial. Appellant thus had the power to decide whether his trial counsel made inquiries of jurors during voir dire regarding whether they could consider EED as a mitigating circumstance and/or emphasized EED during closing argument in the capital sentencing phase.

Because the Commonwealth introduced sufficient evidence to support a finding that Commonwealth's Exhibit 104 was Appellant's certificate of release or discharge from active duty in the U.S. military, *i.e.* a Defense Department (DD) Form 214, the document was properly authenticated under KRE 901(a), which provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." [28] Accordingly, I agree with the majority opinion's Part VII(C)(2) conclusion that "Appellant's DD Form 214 was properly authenticated despite the fact that it was neither certified nor attested and was not introduced by the custodian of the record." [29] I disagree, however, with the majority's suggestion that the DD Form 214 "was self-authenticating under KRE 902(4)." [30] And, I would observe that the logical path that the majority follows to this conclusion is an unnecessar-

ily circuitous one, and one that I predict this Court may trip upon in the future.

The majority first construes KRE 902(4)'s use of "an official publication" to mean that the original (as distinguished from a copy) of any official record is self-authenticating and then turns to KRE 901(a) and determines that the evidence was sufficient to prove that Commonwealth's Exhibit 104 was an original official record, *i.e.,* Appellant's original DD Form 214. Of course, if the proof was sufficient to authenticate the document under KRE 901(a), the "genuineness" of the exhibit had been established, and there would be no need to evaluate whether the document might be self-authenticating under KRE 902. More significantly, however I take issue with the majority's interpretation of KRE 902(4)'s "an official publication" language, which was imported to the Kentucky Rules of Evidence from RCr 9.44 and CR 44.01 (provisions that themselves were taken from Federal Rule of Civil Procedure (FRCP) 44(a)). In my view, this language is duplicative of KRE 902(5), which states that extrinsic evidence of authenticity is not required with respect to "official publications." [31] And, an "official publication" is "[a] document which purports to be *printed* by government authority," [32] *e.g.,* "statutes, court reports, rules and regulations." [33] In other

28. KRE 901(a).

29. *Soto,* 139 S.W.3d at 862.

30. *Id.* at 862.

31. *See* KRE 902(5) ("*Official Publications.* Books, pamphlets, or other publications purporting to be issued by public authority.").

32. 7 KURT A. PHILLIPS, JR., KENTUCKY PRACTICE: RULES OF CIVIL PROCEDURE ANNOTATED, Rule 44.01, at 122 (5th

ed.1995) (emphasis added). *See also United States v. Aluminum Co. of America,* 1 F.R.D. 71, 75 (S.D.N.Y.1939) ("[T]he authenticity of an official document is sufficiently established when a copy of it is offered which purports to have been printed by authority of the Government.").

33. Commentary to KRE 902(5), Evidence Rules Study Commission, Final Draft (November 1989). *See also United States v. Rainbow Family,* 695 F.Supp. 314, 330 n. 5 (E.D.Tex.1988) (portions of United States Army Field Manual found to be self-authenti-

words, the KRE utilize "publication" in a manner consistent with its commonly-understood meaning, *i.e.*, "[g]enerally, the act of declaring or announcing *to the public*." [34] Because Commonwealth's Exhibit 104 was not a published official record within the contemplation of KRE 902(4) or (5), the document was not self-authenticating, and the Commonwealth was required to introduce extrinsic evidence in order to authenticate it.

Because the Commonwealth introduced sufficient extrinsic evidence to do so, however, Commonwealth's Exhibit 104 was properly admitted into evidence. The testimony of Commonwealth's witness Renae Harrison, Appellant's ex-wife, supported a finding that the document was, in fact, what it was entitled, *i.e.*, a "Certificate of Release or Discharge from Active Duty" that identified Appellant by name, date of birth, and social security number.[35] Harrison, who herself had been a member of the United States Army during the time that she and Appellant were married to one another, identified the form as a DD Form 214, explained that standard procedure provided for servicepersons to receive such a form upon discharge, and, after testifying that military procedure requires the person to whom such a form is issued to review and sign it upon receipt, identified Appellant's signature on the form.[36] In addition, I would observe that Appellant's argument to the contrary is somewhat di-

singenuous given that, at an ex parte hearing conducted on June 19, 2000 at which the trial court found that Appellant could voluntarily and intelligently decide to forego the presentation of a theory of the case that would have emphasized extreme emotional disturbance as a defense, *Appellant himself* read a list of his military achievements and awards from a copy of a document that he identified as a "release or discharge from active duty form." Although the document itself was not made a part of the record, Appellant's own description of it as well as the fact that the awards and achievements that Appellant read from the document are listed in the same sequential order in Commonwealth's Exhibit 104 is persuasive evidence that Appellant was reading from a copy of his DD Form (likely provided via discovery) and that Commonwealth's Exhibit 104 was, in fact, the original of Appellant's DD Form 214.

I agree with the majority opinion's Part VII(B) conclusion that the evidence was insufficient to support a conclusion that Appellant was so intoxicated that he did not know what he was doing when he committed these crimes. For the reasons that I have outlined previously,[37] however, I cannot agree with the majority's broad declaration that "[e]vidence of voluntary intoxication does not serve to acquit the defendant, but, if it negates the element of intent, reduces the offense to one having a

cating under FRE 902(5)); *California Ass'n of Bioanalysts v. Rank,* 577 F.Supp. 1342, 1355 n. 23 (C.D.Cal.1983) (report of U.S. Department of Health and Human Services, which bore official seal of that agency on its cover page, found to be self-authenticating under FRE 902(5)).

**34.** *See* BLACK'S LAW DICTIONARY 1242 (7th ed.1999) (emphasis added).

**35.** *See* KRE 901(b) ("[T]he following are examples of authentication or identification

conforming with the requirements of this rule: (1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.").

**36.** *See* KRE 901(b)(2).

**37.** *Fields v. Commonwealth,* Ky., 12 S.W.3d 275, 286–293 (2000) (Keller, J., dissenting).

*mens rea* of wantonness."[38] In my view, an intentional crime does not "somehow sublimate[ ] into an unintentional crime ... when[ever] a defendant is too intoxicated to form the intent to commit the intentional crime."[39] Instead, a lesser-included offense instruction for an offense with a wanton mental state is required only when there is evidence from which a jury could conclude that the defendant acted other than intentionally and that his conduct "objectively and independently of intoxication"[40] created a risk contemplated by the lesser-included offense. In any event, the voluntary intoxication analysis is unnecessary to address Appellant's claim of entitlement to an instruction on Second–Degree Assault because that allegation of error can be dismissed simply by observing that Second–Degree Assault is not a lesser-included offense of Attempted Murder.[41]

In Part IX(B)(5), the majority opinion cites *Foley v. Commonwealth*[42] for the proposition that "KRS 532.055(2) does not apply in capital cases."[43] *Foley*, however, predated a significant 1998 amendment to KRS 532.055, which deleted a provision that read: "This section shall not apply to sentencing hearings provided for in KRS 532.025." And, this Court recently held that, as a result of the amendment, KRS 532.055 is applicable to "all felony cases"[44] and that "KRS 532.055 now supplements KRS 532.055 in capital cases."[45] Accordingly, because KRS 532.055(2) provides that "[t]he jury shall recommend whether the sentences shall be served concurrently or consecutively[,]"[46] the trial court's capital sentencing phase jury instructions *properly* required the jury to make a concurrent/consecutive recommendation.

For the reasons that I articulated in my concurring opinion in *Caudill v. Commonwealth*,[47] I disagree with the majority's suggestion in Part X that the *McClellan v. Commonwealth*[48] definition of EED "does not apply when EED is used as a mitigating circumstance."[49] I agree, however, that the prosecutor's characterization of the EED mitigating circumstance was not "so plainly erroneous as to constitute misconduct."[50]

STUMBO, J., joins this dissenting opinion as to Part I only.

---

**38.** *Soto,* 139 S.W.3d at 867.

**39.** *Fields,* 12 S.W.3d at 293 (Keller, J., dissenting).

**40.** *Id.* at 292.

**41.** *See Holland v. Commonwealth,* Ky., 114 S.W.3d 792, 802 n. 6 (2003).

**42.** Ky., 942 S.W.2d 876 (1996).

**43.** *Soto,* 139 S.W.3d at 872.

**44.** *St. Clair,* 140 S.W.3d at 562.

**45.** *Id.* at 562 n. 5.

**46.** KRS 532.055(2).

**47.** Ky., 120 S.W.3d 635, 682 (2003) (Keller, J., concurring).

**48.** Ky., 715 S.W.2d 464 (1986).

**49.** *Soto,* 139 S.W.3d at 874 (*citing Caudill,* 120 S.W.3d at 673–74).

**50.** *Id.*